Argued and submitted October 20, 1995, reversed and remanded with instructions
February 28, 1996

VERNEDA VILLARREAL ASHLEY,
*Appellant,*

*v.*

Sonia HOYT,
Superintendent,
Oregon Womens Correctional Institution,
*Respondent.*

(94C-11348; CA A86454)

912 P2d 393

Walter J. Todd argued the cause and filed the brief for appellant.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Deits, Presiding Judge, and Landau and Haselton, Judges.

HASELTON, J.

**HASELTON, J.**

Petitioner appeals from a judgment denying post-conviction relief. ORS 138.510 *et seq*. She contends that, at her criminal trial, she was "denied her constitutional right to testify" in her own defense, and that defense counsel's refusal to allow her to testify constituted inadequate assistance of counsel. We reverse and remand.

In 1994, petitioner was convicted of solicitation to commit murder, ORS 163.115; ORS 161.435, attempted murder, ORS 163.115; ORS 161.405, solicitation to commit kidnapping in the first degree, ORS 163.235; ORS 161.435, and attempted kidnapping in the first degree, ORS 163.235; ORS 161.405. The state charged petitioner with hiring Duran, a friend of her estranged husband, to kidnap and kill her husband's live-in girlfriend, Dowell. Duran, who testified that he had "scammed" petitioner by taking her money while pretending to participate in the murder for hire scheme, was the state's principal witness. He testified that petitioner approached him and offered him $2,000 to kidnap and kill Dowell. As part of the alleged scheme, after Duran kidnapped Dowell, he was to force her to call several parties, including Dowell's sister, the husband's landlord, and the Children's Services Division. During those coerced conversations, Dowell was to read from "scripts" that petitioner had written, which would implicate the husband in wrongdoing, including drug possession, and "explain" Dowell's sudden disappearance. Duran identified two pages in petitioner's handwriting as the alleged "scripts." For example, the alleged "script" for the call to Children's Services Division read:

"Her [Dowell's] name ____. License # SSN #

"I am giving you information on [husband]. He does drugs, not watching kid. I had to leave because I'm get[ting] married and I don't want anything [to] happen to Jeramy and Kassy with the drugs or partys [*sic*] at [address] in McMinnville. [Husband] works at Wal-Mart in Mac because he got fired for Zupans [*sic*] for drugs."

Duran further testified that, through a bizarre and convoluted scheme involving a decoy kidnapping in which a blond

friend of Duran's impersonated Dowell, he tricked petitioner into believing that he and an accomplice had kidnapped and killed Dowell. He collected part payment of $700 from petitioner and later told petitioner's husband and Dowell about the plot.

The defense attacked Duran's credibility through several witnesses, including police officers, who testified that Duran had a reputation for being untruthful. However, petitioner did not testify in her own defense. As described below, although petitioner unequivocally told her lawyer that she wanted to testify, defense counsel made a "unilateral decision" not to "allow" her to do so. Consequently, the defense offered no alternative explanation for the origin or purpose of the alleged "scripts." In closing argument, the prosecution highlighted the "scripts" as circumstantial corroboration of Duran's account. Petitioner was convicted and sentenced to 53 months imprisonment.[1] She did not take a direct appeal from her conviction.

Petitioner seeks post-conviction relief on two grounds. First, she alleges that she "was denied due process and equal protection of law under the state and federal constitutions in that she was denied her constitutional right to testify." Second, petitioner asserts that she was denied effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution, and under Article I, section 11, of the Oregon Constitution, in that "[d]efense counsel denied petitioner her right to testify," and "[d]efense counsel improperly advised, or failed to advise, petitioner regarding her testimony, her right to testify, the need for her testimony and the effects of her failure to testify."[2]

In support of those claims, petitioner submitted an affidavit in which her trial counsel stated, in part:

---

[1] Petitioner was also tried on a separate charge of solicitation to commit murder, in which she allegedly solicited another man to kill the same victim. The jury could not agree on a verdict, and a mistrial was declared. The court subsequently dismissed that charge.

[2] Petitioner also asserted that her defense counsel's representation was constitutionally inadequate because he failed to call petitioner and/or her doctor, and that counsel failed to object to evidence of hearsay statements. Those claims are not presented on appeal.

"The defendant [*i.e.*, petitioner] had previously been in a very serious accident which resulted in memory deficiencies and significant physical injuries. She also had no experience in the criminal justice system. As a result of those issues, she totally relied upon [counsel] for decision-making in her defense.

"On the second day of trial during the defense case, I called [defense investigator]. I did not do very well in examining him and I was somewhat off balance after he finished his testimony and the Court took the afternoon break. * * * [At break], I talked with [petitioner] in the hallway about the trial.

"[Petitioner] was emotionally upset and crying. She was extremely distressed that things were not going well and she was concerned that she was going to be convicted. She, at that time, told me that she wanted to take the witness stand and testify.

"I made a unilateral decision that [petitioner] would not be testifying. I did not give her the option to testify. I told her, 'No, I don't want you to testify.' I gave her the reasons why I would not be calling her and referred to a handwritten note that she had allegedly produced that was somewhat incriminating. Regardless of that excuse to her, I had decided that I was not going to call her to the witness stand even if she wanted to testify.

"I did not tell [petitioner] that she had a Constitutional right to testify. After I told her that she was not going to testify, she walked away and did not give any verbal consent.

"* * * * *

"At the time that I told her I would not allow her to testify, I thought that I was making a valid trial strategy decision. I later learned that that is not a trial strategy decision that the attorney can make and that the client must make that decision. I learned that later [in] the evening of November 3, 1993.

"* * * * *

"It is my opinion that [petitioner] did not freely, voluntarily and knowingly waive her constitutional right to testify[.]"

At the post-conviction hearing, petitioner testified that she did not know of her right to testify and that her

attorney told her that she could not take the stand. She further stated that, but for her attorney's advice, she would have testified in her own defense and, in so doing, she would have provided an alternative explanation for the existence of the incriminating "scripts."

In particular, petitioner would have testified that: (1) In March 1992, nine months before the alleged murder for hire scheme, she was involved in a serious auto accident in which she suffered injuries that left her suicidally depressed. (2) At that time, her husband was living with Dowell, and petitioner was upset about that relationship. (3) As a result of her emotional distress, petitioner received counseling from a psychologist who advised her to write down her feelings "instead of keeping everything inside of me." (4) As part of that therapeutic exercise, petitioner wrote the three "script" letters. (5) She wrote those letters with the intent that she would call various parties, pretending to be Dowell and, in so doing, destroy her husband's relationship with Dowell. (6) In December 1992, when the murder for hire scheme allegedly occurred, someone stole $700 in cash from petitioner's dresser drawer, where her letters were also kept. And (7) Duran had access to that drawer.

After hearing the evidence, the post-conviction judge stated:

> "Without prior convictions or something to impeach her credibility, the version she tells about these writings, at least has some initial credibility. It makes sense and it was a less fantastic reason for those documents than the one made by the State, and for a defense attorney not - deciding not to proceed, that type of evidence is bizarre, a bizarre position to make. So that makes me suspect that was not her intention at the time. But I am not entitled to speculate, so I'll go back and look through the documents, and *I think I have to assume, based on this record, she would have testified at that time in accordance to what she testified to today.*" (Emphasis supplied.)

In denying post-conviction relief, the court made the following pertinent findings and conclusions:

"FINDINGS OF FACT

"1.   Petitioner failed to prove that, by not calling her as a witness, trial counsel did not provide professionally competent assistance.

"2.   Petitioner failed to establish a reasonable probability that, had her attorney called her as a witness, the result of her trial would have been different.

"* * * * *

"CONCLUSIONS OF LAW

"1.   Petitioner was not deprived of any constitutional right to testify.

"2.   Petitioner received constitutionally adequate and effective assistance of counsel.

"3.   Petitioner is not entitled to post-conviction relief."[3]

We review the post-conviction court's findings and conclusions for errors of law. ORS 138.650; ORS 138.220; *Yeager v. Maass*, 93 Or App 561, 564, 763 P2d 184 (1988), *rev den* 307 Or 340 (1989). Petitioner is entitled to post-conviction relief if she proves, by a preponderance of the evidence, that she suffered a substantial denial of a state or federal constitutional right in the proceeding below, which renders the conviction void. ORS 138.620(2); ORS 138.530-(1)(a).

On appeal, petitioner reiterates her claims that the trial court denied her a constitutionally conferred right to testify in her own defense and that her defense counsel was constitutionally inadequate in that he not only failed to advise petitioner that she was entitled to testify, but, indeed, misled her as to the existence of such a right and thwarted her expressed desire to testify. We agree with petitioner that she is entitled to post-conviction relief based on the second, inadequate assistance, ground. Consequently, we do not address the first.

_____

[3] In addition to petitioner's testimony and defense counsel's affidavit, the evidence before the trial court included the transcript of the criminal trial, exhibits from that trial, including the "scripts," and an affidavit from the prosecutor describing how the prosecution would have attacked defendant's version of the events if she had testified.

■ ■    In considering petitioner's inadequate assistance claim, we look first to the Oregon Constitution. *See State v. Kennedy*, 295 Or 260, 262-68, 666 P2d 1316 (1983) (in general, state constitutional claims are to be considered before addressing federal constitutional claims). Under Article I, section 11, of the Oregon Constitution, criminal defendants are entitled to "adequate performance by counsel of those functions of professional assistance which an accused person relies upon counsel to perform on his behalf." *Krummacher v. Gierloff*, 290 Or 867, 872, 627 P2d 458 (1981). In *Stevens v. State of Oregon*, 322 Or 101, 902 P2d 1137 (1995), the court reiterated and clarified a petitioner's burden in demonstrating constitutionally inadequate assistance for purposes of Article I, section 11. First,

> "a petitioner must show, 'by a preponderance of the evidence, facts demonstrating that trial counsel failed to exercise reasonable professional skill and judgment[.]' " *Id.* at 108 (quoting *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991)).

Second, if defense counsel's conduct breached the standard of professional representation, petitioner must show prejudice of constitutional magnitude — that is, that counsel's advice, acts, or omissions had "*a tendency to affect the result of the prosecution.*" *Id.* at 110 (emphasis in original).

■    Petitioner's inadequate assistance claim rests on the premise that the Oregon Constitution guarantees criminal defendants the right to testify in their own behalf. Although the United States Supreme Court has recognized such a right under the federal constitution, *Rock v. Arkansas*, 483 US 44, 107 S Ct 2704, 97 L Ed 2d 37 (1987),[4] the Oregon Supreme Court has never explicitly recognized a parallel protection under Article I, section 11, of the Oregon Constitution. *Accord* Christopher D. Jaime, *Sword and Shield: An*

---

[4] In *Rock*, the Court held that the accused's right to be heard derives from the Fourteenth Amendment's guarantee "that no one shall be deprived of liberty without due process of law," from the compulsory process clause of the Sixth Amendment, "which grants a defendant the right to call witnesses in his favor," and as "a necessary corollary to the Fifth Amendment's guarantee against compelled testimony." *Id.* at 51-52. Thus, the right to testify is fundamental and personal to the defendant, and may only be relinquished by the person to whom it belongs — the defendant in a criminal trial. *U.S. v. Martinez*, 883 F2d 750, 756 (1989), *vacated on other grounds* 928 F2d 1470 (9th Cir 1991).

*Analysis of Criminal Defendant's Right to Be Heard Under Article I, Section 11 of the Oregon Constitution*, 28 Will L Rev 127 (1991) (canvassing history of provision). That provision provides, in part:

> "In all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel."

Although there is no binding precedent on the issue, both this court and the Oregon Supreme Court have implied that Article I, section 11, guarantees the right to testify. In *State v. Eusted*, 12 Or App 351, 355, 507 P2d 60 (1973), we stated, in *dictum* and without elaboration, that under Article I, section 11, "[i]t is the right of the defendant to testify in his own behalf in a given case."

Moreover, in a special concurrence in *State v. Douglas*, 292 Or 516, 520-38, 641 P2d 561 (1982), Justices Lent, Linde, and Peterson agreed that Article I, section 11, guarantees criminal defendants the right to testify in their own behalf.[5] The *Douglas* concurrence canvassed the history of the right to be heard, noting that until 1864, Oregon courts followed the common law rule that criminal defendants were incompetent to testify, and that from 1864 to 1880, testimony by criminal defendants was similarly barred by statute. Notwithstanding that history, the concurrence concluded that Article I, section 11, must be construed by reference to modern criminal trial process as embodying the right to testify. *Id.* at 536-37. The Oregon Supreme Court has subsequently, albeit in *dictum*, cited the *Douglas* concurrence with approval. *See State v. Stevens*, 311 Or 119, 124, 806 P2d 92 (1991) ("Article I, section 11, grants two distinct, not overlapping, rights: the defendant's right to make a statement and to testify, and the defendant's right to be represented by counsel.").

Some aspects of the *Douglas* concurrence are somewhat enigmatic. In particular, the opinion does not fully explain why the content of the "right * * * to be heard" in Article I, section 11, is to be defined by reference to the evolution of modern trial practice, and not by reference to the meaning of that phase as understood in 1857.

---

[5] The majority in *Douglas* based its disposition on statutory, rather than constitutional, grounds.

Nevertheless, we agree with that opinion's overarching observation that, with respect to Article I, section 11,

> "[e]volution of the law is consistent with the intent of the drafters of our Constitution. Those men were aware of the changing nature of legal rules. * * * There is no reason to believe that the framers of our Constitution intended to freeze the defendant's constitutional rights [under Article I, section 11] in the form of rules that they realized were then undergoing changes." 292 Or at 536.[6]

We thus conclude that Article I, section 11, guarantees criminal defendants the right to testify in their own defense.

■ We turn, then, to the relationship between that right and defense counsel's advice and conduct in petitioner's criminal case. To render professionally adequate representation, criminal defense counsel must

> "[inform] the defendant, in a manner and to the extent appropriate to the circumstances and to the defendant's level of understanding, of the existence and consequences of nontactical choices which are the defendant's to make, so as to assure that the defendant makes such choices intelligently. *This function of counsel is particularly important when a defendant is called upon to waive fundamental rights, as by a guilty plea or waiver of jury trial*[.]" *Krummacher*, 290 Or at 874-75 (citation omitted; emphasis supplied).

■ Here, petitioner's criminal defense counsel averred that he did not inform his client of her constitutional right to testify; that, despite petitioner's express request to testify in her own defense, "he did not give her the option to testify";

---

[6] In so concluding, the *Douglas* concurrence invoked the United States Supreme Court's analogous observations with respect to an evolving understanding of the content of the Seventh Amendment:

"The Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial according to the common law in 1791, any more than it tied them to the common-law system of pleadings or the more specific rules of evidence then prevailing. * * * The more logical conclusion, we think, and the one which both history and the previous decisions here support, is that the Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among the common-law jurisdictions." *Galloway v. United States*, 319 US 372, 390-92, 63 S Ct 1077, 87 L Ed 1458 (1943).

and that, regardless of any justification he offered to his client, "I had decided that I was not going to call her to the witness stand even if she wanted to testify." The state does not dispute that account, and the trial court assumed its truth. Counsel's conduct and advice — or nonadvice — in that respect was based on his belief that criminal defense counsel can unilaterally decide, as a matter of "trial strategy," whether to "allow" their clients to testify. That belief was erroneous.

Counsel's conduct in preventing his client from testifying, notwithstanding her express desire to do so, breached the standard of professional representation. Whatever valid reasons counsel might have had for *advising* his client not to testify — and we fully appreciate that a range of considerations, including tactical considerations, may justify such advice — the ultimate decision had to be hers. By disregarding his client's express desire to testify — indeed, by unilaterally usurping the decision to exercise that right — counsel rendered inadequate assistance. *Accord* American Bar Association Standards for Criminal Justice 4-5.2(a)(iv) (1991) (decision of whether criminal defendant should testify in his or her own defense is ultimately to be made by the accused after full consultation with counsel).[7]

We turn, finally, to whether petitioner proved constitutionally cognizable prejudice from counsel's breach. The post-conviction court determined that "petitioner failed to establish a reasonable probability that, had her attorney called her as a witness, the result of her trial would have been different."[8] That determination is based — however understandably, given our pre-*Stevens* decisions — on an erroneously rigorous legal standard of prejudice. In *Stevens*, the court clarified that a post-conviction petitioner need not show a substantial probability that, but for defense counsel's

---

[7] *Cf. Wright v. Estelle*, 572 F2d 1071, 1078-79 (5th Cir), *cert den* 439 US 1004 (1978) (Godbold, J., dissenting) ("[A criminal defendant's] desire to tell 'his side' in a public forum may be of overriding importance to him. * * * The wisdom or unwisdom of the defendant's choice does not diminish his right to make it.").

[8] The trial court styled that determination as a "finding of fact." However, as amplified below, the determination of whether conduct was prejudicial in a constitutionally cognizable sense is better characterized as a legal conclusion, derived from predicate findings of historical fact. *See Krummacher*, 290 Or at 869.

breach, the result of the criminal trial would have been different. 322 Or at 110 n 5. Rather, petitioner is entitled to relief if counsel's acts or omissions had "a *tendency to affect the result* of the prosecution." *Id.* at 110 (emphasis in original).

■      Given *Stevens'* intervening reinstruction on the standard of prejudice, we are faced with the choice of either: (1) remanding the inadequate assistance claim for the trial court to apply the "tendency" standard; or (2) applying that standard ourselves, without remand. Either course has principled merit. The first comports with our frequent practice of affording trial courts the initial opportunity to apply a new, clarified, or refined legal standard. The second — which is the course the Supreme Court took in *Stevens* — recognizes the practical exigencies of post-conviction relief: The ultimate determination of prejudice is a matter of law and not of fact, *see Krummacher*, 290 Or at 869,[9] and, if the trial court has rendered findings on all historical facts material to assessing prejudice, this court is fully competent to determine whether petitioner has suffered prejudice of a constitutional magnitude. In those circumstances, remand may only serve to delay the ultimate availability of post-conviction relief and, in so doing, prolong a petitioner's incarceration.[10]

In this case, we choose the second course. Given our review of the record, we believe that the post-conviction court rendered all findings material to the "tendency to affect" standard of prejudice. In particular, the court, after expressing some initial uncertainty on the matter, found that petitioner "would have testified at [the time of trial] in accordance to what she testified today." Although that oral finding was not incorporated into the court's written findings and conclusions, nothing in the court's written disposition is inconsistent with that oral finding, and the state does not argue otherwise.

---

[9] In *Krummacher*, the court observed: "Insofar as the findings relate to historic facts, they are binding on appeal; as they give constitutional characterization to the facts, we are bound by the implied historical findings, but we must reexamine the constitutional determinations." 290 Or at 869.

[10] Here, for example, petitioner has been incarcerated for more than two years, representing nearly half of her 53-month sentence.

Our inquiry reduces to whether, if petitioner had testified in her own defense in the manner she described, that testimony would have had a tendency to affect the outcome of her trial. Based on the totality of the circumstances of petitioner's criminal trial and conviction evinced in the post-conviction record, *see* n 3 above, we conclude that petitioner has demonstrated the requisite "tendency."

That conclusion flows from an array of considerations. First, the prosecution's theory of the case depended on a bizarre tangle of unrequited love and revenge, "scamming hit-men" and staged abductions, double crosses and decoy victims. The post-conviction court termed Duran's account "fantastic." Second, Duran's general credibility was suspect. Third, the handwritten "scripts" were central to the prosecution's scenario—indeed, the prosecution highlighted those documents as corroborating petitioner's culpability. Fourth, in testifying, petitioner would have presented an exculpatory explanation for those writings — an explanation arguably no more "fantastic" than the prosecution's version of events. Finally, although the prosecutor might have exploited arguable gaps and contradictions in petitioner's account and emphasized that petitioner had previously threatened her supposed target, Dowell, it does not appear that petitioner would have been subject to impeachment based on prior convictions or prior inconsistent statements.

In identifying those cumulative factors, we do not, of course, imply any view as to the ultimate credibility or persuasiveness of petitioner's putative testimony. Rather, we conclude that those factors suggest that, in a case involving convoluted facts that were arguably susceptible to differing interpretations, and in which credibility played a critical role, the accused's testimony in her own defense might well have had a "tendency to affect the result." *Stevens*, 322 Or at 110. Consequently, petitioner is entitled to post-conviction relief.

Reversed and remanded with instructions to enter judgment allowing post-conviction relief.