Argued and submitted August 6, affirmed December 26, 2007

MARIAN KINCEK,
*Petitioner-Respondent,*

*v.*

Guy HALL,
Superintendent,
Two Rivers Correctional Institution,
*Defendant-Appellant.*

Umatilla County Circuit Court
CV060391; A133859

175 P3d 496

Carolyn Alexander, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Andy Simrin argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

LANDAU, P. J.

## LANDAU, P. J.

Petitioner was convicted of attempted murder, assault, and unlawful use of a weapon, arising out of an incident in which he shot his wife. We affirmed petitioner's convictions without opinion in *State v. Kincek*, 197 Or App 494, 108 P3d 118 (2005). Petitioner filed a petition for post-conviction relief, asserting that his trial counsel was constitutionally inadequate in failing to call as a witness a psychologist who would have testified about petitioner's mental state at the time of the offenses. The court granted the petition for post-conviction relief. The state now appeals, asserting that the post-conviction court erred in ordering post-conviction relief. The state contends that, although petitioner's trial counsel may have been inadequate, petitioner did not demonstrate that the inadequacy prejudiced his defense. We affirm.

In the underlying criminal trial, the evidence showed that petitioner and the victim, his wife, had recently separated after 25 years of marriage. Petitioner had suspected her of infidelity with a man named Gordon and had even placed a recording device in the bedroom in an effort to capture conversations between the victim and her suspected lover. He threatened to kill the victim and himself before he would be divorced from her.

One evening, petitioner entered the bedroom of the house where the victim was living and found her lying on the bed, engaging in sexual activity while talking on the telephone to Gordon. The recording device that petitioner had previously placed in the bedroom recorded the incident. At the time, petitioner either had a gun with him or picked up a gun that was kept in the bedroom, held the gun to the victim's head, and threatened several times to kill her. He said that, "if he couldn't have her, no one could." Petitioner also told the victim that he had to kill her and that, "if I kill you and then kill myself, we can hold hands and go to heaven together." After a struggle in the bedroom, matters calmed down, and the two moved into the hallway. There, the victim told petitioner that she did not love him, that she was in love with Gordon, and that she wanted a divorce; petitioner then

shot the victim in the ankle. Petitioner was arrested. A detective on the scene later recalled that petitioner told him that, at least "for a period of time" during the event, petitioner had intended to kill the victim and himself.

Petitioner admitted that, when he first encountered the victim in the bedroom, he jumped on top of her with the gun in his hand, grabbed her, pushed her, and held her down with his left hand. He admitted that he told the victim that he was going to kill both her and himself and told her, "Let's go to heaven together." Petitioner testified, however, that he held the gun to his own head and threatened to shoot himself, but did not point the gun at the victim's head, and he denied ever intending to hurt her. He testified that he shot the victim accidentally when he was attempting to put the gun in his pocket while the two of them were in the hallway.

Before trial, defense counsel had sought to introduce the expert testimony of Davis, a clinical psychologist. Davis had prepared a written psychological evaluation and report in which he concluded that petitioner had never intended to shoot his wife. According to Davis, at the time of the incident, petitioner was acutely depressed. In Davis's opinion, petitioner had not gone to the house for the purpose of harming the victim, and the incident was precipitated by the shock of discovering his wife having phone sex with another man and by her announcement, after earlier denials, that she was in love with another, utterly rejecting defendant.

The trial court said that Davis would not be allowed to testify as to the ultimate issue of petitioner's intent but that he could testify generally concerning petitioner's state of mind:

> "[Davis] gets to, in a general way, talk about the tests he gave without going into a great deal of detail. He gets to talk about passivity and dependence. He gets to talk about depression and stress. He does not get to talk about whether defendant acted with a conscious objective to cause the death or physical injury to his wife. He does not get to talk about what defendant had in mind when he came to the house, and he doesn't get to talk about what defendant had in mind when he picked up the gun."

Trial counsel, however, did not call Davis to testify at all. The jury convicted petitioner of attempted murder with a firearm and unlawful use of a weapon based on the incident in the bedroom, and assault in the fourth degree and assault in the second degree with a firearm based on events in the hallway.

In his petition for post-conviction relief, petitioner asserted that, among other things, counsel was inadequate in failing to present Davis's testimony concerning his psychological evaluation, which petitioner asserted was relevant to the issue of whether he had the requisite mental state to commit attempted murder in the bedroom. In support of his claim, petitioner submitted to the post-conviction court Davis's psychological evaluation of petitioner. He also submitted an affidavit from an attorney expert, Ledesma, who described Davis's report as highly favorable to the defense. According to Ledesma's affidavit,

> "In my years of practice including the use of psychological experts at the trial level, use of psychological reports in presentence evaluation reports, and my review of countless psychological evaluations in parole appeals and criminal appeals I have handled, I do not believe I have ever seen an evaluation that was more favorable to the defendant than the one performed by Dr. Davis on [petitioner].
>
> "* * * * *
>
> "27)   If Dr. Davis had been called to testify, he would have informed the jury * * * that when petitioner walked in on his wife having phone sex with her lover, the emotional intensity of the moment disrupted his logical frame of mind. Defendant was not under the influence of alcohol or other intoxicants during the crime. The loaded gun was usually kept by the side of the bed. Petitioner maintained that he emptied the gun of bullets and thought it was cleared altogether.
>
> "28)   Dr. Davis would have explained that petitioner's sister thought that the violent episode was out of character for petitioner and [the victim]. Petitioner's son informed Dr. Davis that petitioner never intentionally tried to hurt or harm his mother. Petitioner's son did not believe that petitioner went to the house that night intending to harm his mother. Regarding the gun, petitioner's son explained that petitioner was not familiar with the operation of the gun;

"29) Though Dr. Davis's observations about [petitioner] were highly favorable, the conclusions he reached from his tests would have been even more favorable to the defense. Dr. Davis concluded that [petitioner] executed the tests and generally did well. In a self-report, petitioner noted that he was 'moderately depressed' at the time of the crisis, but was better adjusted at the time of the evaluation. The MCMM-II portrayed petitioner as having some psychological problems of only mild severity. Dr. Davis noted that the test result indicated that petitioner is essentially a 'normal' person with undergoing some unusual life stress at present. Dr. Davis opined that petitioner would conduct himself lawfully almost 'one hundred percent of the time.' There was no indication of violent intentions directed at himself or others. The inkblot test resulted in factors that are thought to be indicative of 'good ties to reality and socialization.'

"30) Petitioner's score was 'very low' on a research scale designed to measure whether someone would commit a violent act after having committed one before. Petitioner's MMPI-2 results were 'entirely within normal limits.'

"31) If Dr. Davis had testified, he would have informed the jury that at the time of the shooting, petitioner was acutely depressed. Dr. Davis's testimony would have informed the jury that he was no longer depressed, that he felt the need to make a theatrical demonstration on the night of the shooting, and he was 'yearning and working for reconciliation.'

"32) Dr. Davis's report indicates, 'It is my conclusion that he never intended to shoot his wife' and 'I do not believe [petitioner] deliberately shot [the victim].' Although the court's pre-trial ruling might have precluded Dr. Davis from testifying to those conclusions directly, it is clear from the transcript that the court expressly approved Dr. Davis to testify about hypotheticals that the jury could have used to understand [petitioner's] case and to reach those exact conclusions with respect to him;

"33) There was absolutely no conceivable down side to presenting Dr. Davis's testimony, and it would have enabled the jury to understand how it was that [petitioner] could have engaged in the behavior that he did without intending to kill his wife. In the absence of the sort of expert testimony that Dr. Davis could have given, the likelihood of

a jury understanding that would be virtually non-existent. Consequently, Dr. Davis's testimony was essential to the case, and there is a significant likelihood that the jury could have acquitted him if it had had the benefit of that testimony. Under the circumstances of this case, it could not possibly have been a reasonable tactical decision by [trial counsel] to fail to call Dr. Davis as a witness;

"34) Because there is little chance that a jury would acquit [petitioner] of attempted murder without Dr. Davis's testimony, but a significant chance that a jury would have acquitted him if it had heard his testimony, there is little question that [trial counsel's] failure to call him as a witness had a tendency to affect the outcome of the case[.]"

Petitioner also offered an affidavit of his criminal trial counsel, who agreed with Ledesma that Davis's testimony would have enabled the jury to understand how petitioner could have engaged in the conduct that he did and said the things that he did without ever intending to kill his wife.

The post-conviction court granted petitioner's petition for post-conviction relief. The court explained its decision as follows:

"The only thing that really bothers me in this case that I've really struggled with is this issue around this psych[ological] eval[uation] and what to do with that, and what wasn't done with that. And the reason I struggle, and the part about being blunt here, is that in my estimation, having read the transcript, having read all this stuff, this case was a dead-bang loser from the beginning. *I don't believe there is a chance in hell even Perry Mason would have won this case.*

"So that's why I struggle here with the issue around this evaluation and not calling the doc[tor]. I think that that's probably, without a doubt from my perspective, that's the biggest screw-up [trial counsel] made.

"The question really comes down to, how do I balance that with my belief that even if he called and *even if he'd gotten everything in he wanted to get in, I don't think it would have made a bit of difference.*

"But the fact is that—well, he should have called the doc[tor]. He should have gotten in what he could get in. He

should have made a record and made an offer of proof on what he couldn't get in.

"* * * [H]e didn't even try to get it in, and that isn't quite the same as not getting it in and not doing an offer of proof, for instance to lay the groundwork for an appeal. This is just sort of rolling over and giving up, and that's where— that's the place where I come down and say, '*Well, yeah, I believe that even if it all came in, the jury wouldn't have done anything differently,*' *but that's my opinion, and others could have a different opinion* * * *.

"* * * * *

"So, to me, the failure to even try to get this in and make a record, I think that's a pretty gross error, and I think that's gross enough that, certainly, *given the testimony of Defense Attorney Ledesma*, I think that tips the scale, and I do believe that on that issue, that's an important enough one that [petitioner] gets to win on that one.

"And so I do believe that that issue tips it over the top. I think he does get post-conviction based on that, and it needs to go back to a new trial."

(Emphases added.)

On appeal, the state contends that the post-conviction court erred in granting post-conviction relief. The state does not dispute the post-conviction court's determination that criminal trial counsel performed deficiently in failing to offer the testimony of Davis. The state's argument is that the post-conviction court's finding that, even if Davis had testified, "I don't think it would have made a bit of difference," foreclosed post-conviction relief. According to the state, the post-conviction court essentially found that trial counsel's deficient performance did not prejudice petitioner's defense.

Petitioner responds that the state has "cherry-picked out of context" a single remark from the post-conviction court's oral description of its thought processes. Petitioner notes that, although the court initially opined that, it did not believe that "even Perry Mason would have won the case," the court went on to say that "others could have a different opinion." More importantly, petitioner contends, the post-conviction court expressly stated that, "given the testimony of Defense Attorney Ledesma"—who had testified that, in his

opinion, petitioner definitely was prejudiced by trial counsel's failure to call Davis—post-conviction relief is appropriate.

■■■ To prevail on a post-conviction claim of inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution, petitioner must prove, by a preponderance of the evidence, facts demonstrating that trial counsel failed to exercise reasonable professional skill and judgment and that petitioner suffered prejudice as a result. *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991). To prevail under the United States Constitution, petitioner must prove that trial counsel's performance "fell below an objective standard of reasonableness * * * under prevailing professional norms" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 US 668, 688, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984). *See* ORS 138.530(1)(a) (post-conviction relief is available for substantial denial of rights under the state or federal constitution). In order to prove prejudice of a constitutional magnitude, petitioner must show that "counsel's advice, acts, or omissions had 'a tendency to affect the result of the prosecution.'" *Ashley v. Hoyt*, 139 Or App 385, 392, 912 P2d 393 (1996) (quoting *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995)). Whether a petitioner has demonstrated prejudice is a question of law that, in turn, may depend on predicate findings of fact. *Ashley*, 139 Or App at 395 n 8. If the post-conviction court made such predicate findings, we are bound by them if they are supported by evidence in the record; if the post-conviction court did not expressly make such findings, we nevertheless assume that it did so in a manner consistent with its ultimate conclusion of law. *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002).

In this case, as we have noted, the state does not dispute the post-conviction court's conclusion that trial counsel's performance was deficient. It contends only that the post-conviction court's comment that Davis's testimony would not have made a difference precludes granting post-conviction relief. According to the state, the post-conviction court

"apparently conflated the two prongs of the inadequate assistance standard—or, in the alternative, simply overlooked or misunderstood the prejudice prong."

We agree with petitioner that the state's argument is predicated on an unduly selective reading of the post-conviction court's comments and an assumption that the selected portion cannot be reconciled with the post-conviction court's ultimate decision. Clearly, the post-conviction court *began* its colloquy with an opinion that including Davis's testimony would not have made a difference. But the court then quickly equivocated on that very point. The court added, "But the fact is that—well, he should have called the doc[tor]. He should have gotten in what he could get in." The court said that, although it had just said that the jury would not have done anything differently, "but that's my opinion, and others could have a different opinion." The court then added that trial counsel's failure to even offer Davis's testimony was "a pretty gross error, and I think that's gross enough that, *certainly given the testimony of Defense Attorney Ledesma*, I think that tips the scale." (Emphasis added.) Ledesma, it should be recalled, expressly concluded that, because there was "a significant chance that a jury would have acquitted [petitioner] if it had heard [Davis's] testimony, there is little question that [trial counsel's] failure to call him as a witness had a tendency to affect the outcome of the case." It was in that context that the post-conviction court then concluded that "that issue tips it over the top. I think that he gets post-conviction relief based on that." And, in that context, it becomes clear that the post-conviction court did not misunderstand the relevant standard for determining prejudice. To the contrary, the court apparently understood the appropriate test and correctly applied it.

■    Even assuming that the state were correct that the post-conviction court's colloquy reflects inconsistent findings, however, the state would not be entitled to the reversal that it seeks. In the case of inconsistent findings, we favor those that support the relief that the post-conviction court granted, as long as there is evidence to support them. *Hinton v. Hill*, 197 Or App 238, 242, 105 P3d 923 (2005). We do not—as the

state appears to assume—favor the findings that are inconsistent with the relief actually granted. *Cf. Gourley v. Towery*, 82 Or App 32, 727 P2d 144 (1986). ("We have the authority and, perhaps, the obligation to construe an ambiguous judgment in light of the record to give effect to the trial court's intent.").

■    The state argues that, in any event, as a matter of law, the admission of Davis's testimony could not have had a tendency to affect the outcome of this case "because there was overwhelming evidence of petitioner's intent to kill his wife," in particular, petitioner's admission to a detective that he had intended to kill the victim and himself. As petitioner points out, however, the issue of defendant's intention in shooting the victim was vigorously contested. He had testified at the criminal trial that, although he had said that he thought about killing the victim, he never actually intended to do so and that, instead, he intended the incident to make a "dramatic theatrical display" in response to his wife's unfaithfulness. The actual shooting, which took place later in the hallway, he testified, was an accident. Davis's testimony plainly would have supported that version of events. As Ledesma pointed out in his affidavit, even if Davis had not been permitted to testify as to the specific issue of petitioner's intent, Davis's testimony would have been "highly favorable" to the defense. On the record before us, we cannot say that such testimony would not have had "a tendency to affect the result of the prosecution." *Lichau*, 333 Or at 365.

Affirmed.