Argued and submitted October 6, 2010, judgment vacated and remanded for entry
of judgment granting petition for post-conviction relief with respect to convictions
for attempted aggravated murder, attempted murder, and burglary in the first
degree, and denying such relief on all other convictions December 14, 2011

NATHAN GALLOWAY,
*Petitioner-Respondent,*

*v.*

Mark NOOTH,
Superintendent,
Snake River Correctional Institution,
*Defendant-Appellant.*

Malheur County Circuit Court
09037239P; A143119

268 P3d 736

Patrick M. Ebbett, Assistant Attorney General, argued
the cause for appellant. With him on the briefs were John R.
Kroger, Attorney General, and Jerome Lidz, Solicitor
General.

Dennis Balske argued the cause and filed the brief for
respondent.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.*

SCHUMAN, P. J.

* Brewer, C. J., *vice* Rosenblum, S. J.

## SCHUMAN, P. J.

Petitioner brought this action for post-conviction relief after having been convicted of arson, first-degree burglary, reckless endangerment, attempted murder, and attempted aggravated murder. The post-conviction court granted a new trial on the ground that petitioner's trial counsel provided inadequate assistance (1) by failing to investigate and discover evidence that would have undermined the state's case that the threat posed by the fire was serious and (2) by failing to discredit petitioner's codefendant, who made statements to the police implicating petitioner in the charged crimes. Defendant appeals, arguing that petitioner's counsel was not constitutionally deficient; that, even if she was, petitioner was not prejudiced as a result; and that, in all events, the post-conviction court's grant of a new trial on all counts is an error apparent on the face of the record. We conclude that petitioner's defense was prejudicially affected by counsel's constitutionally deficient performance with respect to petitioner's convictions for attempted aggravated murder, attempted murder, and first-degree burglary, but not with respect to his other convictions. Accordingly, we vacate the judgment and remand for entry of a judgment granting post-conviction relief on the charges of attempted aggravated murder, attempted murder, and first-degree burglary, and denying such relief on all other charges.

The charges against petitioner in the underlying criminal case stemmed from the allegation that he set a fire in the basement garage of the home of Crook County Deputy District Attorney Ron Brown in the early morning hours on August 14, 2002, and another fire in a nearby park the following night. A grand jury indicted petitioner on nine counts of attempted aggravated murder, five counts of attempted murder, six counts of first-degree arson, two counts of first-degree burglary, four counts of recklessly endangering another person, and one count of second-degree arson. The second-degree arson charge was based on the fire at the park; all of the other counts were based on the fire at Brown's home. Two of petitioner's friends, Buker and Walsh, were also convicted of a number of offenses based on the fires. Buker went to trial after petitioner; Walsh entered into a plea agreement after Buker's trial.

Evidence of the following facts was presented at petitioner's criminal trial. On two occasions in May 2002, before the fires at issue in this case, petitioner was arrested, and Brown filed informations charging petitioner with fourth-degree assault and second-degree theft. When petitioner was lodged in the Crook County Jail following his second arrest, he was intoxicated, and he made boisterous statements and threats, including, "I'm going to kill those fucking cops," "[F]uck you and the government," "Fuck the DA, I don't like the DA," "Crook County Circuit Court, you make no fucking sense," and, "I've killed hundreds of thousands of people." Petitioner was later released.

Petitioner had a court appearance on August 8, 2002. Although Brown had filed the charges in that case, he was not the prosecutor appearing for the state. Later that day, petitioner told Buker that he was being prosecuted for something he did not do. He stated that he was "going to fix it" and was going to set something on fire or blow something up. Petitioner's statements were overheard by Prewitt, a friend of Buker's.

A few days later, Buker borrowed a bottle of rubbing alcohol from a neighbor.

On August 14, 2002, at around 1:00 a.m., petitioner was with Buker and Prewitt and again said that he was going to "fix somebody that was prosecuting him" by "blowing somebody up and blowing up a DA's house." Prewitt testified at petitioner's criminal trial that she did not take him seriously at the time.

At about 3:00 a.m. the same day, Brown and his family awoke to a smoke detector sounding. Brown could smell smoke as he went down the stairs to the main floor of the house. He did not see any smoke on that floor, so he opened the door leading to the basement garage. The stairwell was full of smoke. He slammed the door shut and called 9-1-1 while his wife got their three children out of the house. Two police officers, McMurrian and Bottoms, responded to the call. McMurrian, who arrived first, found the garage door open and a fire burning inside. The garage was filling with smoke. According to McMurrian, when he first went into the garage, the fire was six to seven feet across and the flames

were six to seven feet high and were hitting the exposed joists above. He attempted to put it out with a fire extinguisher, but the fire continued to burn after the extinguisher was exhausted. He and Bottoms then retrieved a garden hose that Brown had pulled around from the side of the house. According to Brown, the flames were five to six feet high at that point. The officers put the fire out with the hose. The fire department arrived shortly thereafter.

The fire had burned some clothing and a scarecrow that were piled on an area rug on the concrete floor, in front of the washer and dryer. Various small plastic items were found in the pile, melted and burned, including some toothbrushes and two spare wheels from a stroller. The Browns used their garage as a storage room. Items in the garage included children's and adults' bicycles, a baby crib, a high chair, and toys. A gasoline can was within 10 feet of the fire. Brown checked the can and found that it contained the same amount of gasoline that it had before the fire. Other than the items in the pile and the rug, nothing was burned. However, a section of the heating duct along the ceiling in the garage had been removed and was lying on the floor. Brown said that the duct had been intact the day before.

Petitioner was seen by the police two blocks from the Browns' house shortly after the fire there was extinguished. He told them that he had seen the fire trucks go by and was trying to see what was going on.

The firefighters concluded that the fire resulted from spontaneous combustion caused by compression of bleach and laundry detergent. They began to clean up the fire scene. Later in the day, Brown put some of the burned items in the garbage, which was picked up the same day.

The next night, at about 1:30 a.m., a fire was set at Ochoco Creek Park. Several items, including cups from a nearby convenience store and the top half of a package of chewing gum, were found at the scene. McMurrian and Bottoms, who both responded to that fire as well, went to the convenience store and learned that petitioner, Buker, Walsh, and a woman, Close, had been there earlier in the night, and that Close had purchased the same kind of gum as the package found in the park. The officers went to Buker and Walsh's

apartment, which was within two blocks of the park and three blocks of Brown's house. As they were arriving, they saw petitioner and Buker walking toward the apartment from the direction of the park. Bottoms told petitioner that it was suspicious that he had been seen near both fires, to which petitioner replied that Bottoms "couldn't prove anything." The officers went into the apartment, where they found Close. Bottoms found the other half of the chewing gum package in Buker's bedroom.

Later that morning, at about 8:30 a.m., an Oregon State Police arson detective, Kollen, went to the park to investigate. He found that there were actually two separate fires started there. A partially burned piece of notebook paper was found at the starting point of one of them. Kollen concluded that the fires had been intentionally set. The paper was later matched to a notebook belonging to Buker.

After investigating the park fire, Kollen went to the Browns' house. He had been told that the fire department had concluded that the fire there was caused by spontaneous combustion. When he arrived, he immediately saw the disconnected heating duct and became suspicious. The remains of the burned clothing had been rolled up in a piece of carpet and were sitting outside the house. Kollen picked through the remains and found a burned book of matches. The Browns did not keep matches in the house. Kollen concluded that the fire there was also an arson.

At petitioner's criminal trial, Kollen testified that he had not smelled any accelerant at the Browns' house but that he believed one had likely been used to start the fire, because clothing generally does not readily burn, and it appeared to him that the items in the pile had "burned pretty good." He testified that petroleum-based accelerants often leave a "sheen" that is visible when water is poured on the area where the fire started. He said he had poured water on the garage floor and that there was no sheen. He therefore suspected that alcohol, which does not leave any sheen, had been used. Kollen acknowledged that a crime lab report indicated that no flammable liquid was found on items from the fire that were tested, but he testified that the crime lab cleans its equipment with alcohol, so items are not tested for alcohol

unless that test is specifically requested, in which case the equipment is first cleaned with another substance. Testing for alcohol was not requested in this case, he said, so it was to be expected that the report would show that no alcohol was found. Kollen did not explain why the test was not requested.

Petitioner was arrested in connection with the fires on the same day that Kollen investigated them. He was lodged at the Crook County Jail. A corrections deputy placed petitioner in a cell opposite the cell in which two of petitioner's friends were lodged. The deputy overheard petitioner talking to one of his friends. Petitioner said that the police were "trying to pin the fire down at the DA's house on [him]." The friend asked if petitioner had an alibi. He replied, "I told my girlfriend what to say to the cops."

Buker was interviewed by the police several times in the week following the fires. He initially denied knowing anything about either incident. Over the course of the interviews, however, he eventually implicated petitioner in both fires and then admitted that he was involved in both as well. Ultimately, Buker said that he, petitioner, and Walsh had been together, and Walsh said that he had walked past Brown's house and the garage door was open. According to Buker, Walsh said he had seen motorcycles in the garage, and the three of them walked there with the intention of stealing the motorcycles. Buker said that petitioner went into the garage and came out saying that there was nothing worth stealing. He said that they then went back to Buker and Walsh's apartment, retrieved a bottle of rubbing alcohol, and returned to the Browns', where petitioner started the fire while he and Walsh stayed across the street. Among other things, Buker also stated that, on the way back to the Browns' house, petitioner told him that they were going to burn it "from the ground up."

While petitioner was in jail, he admitted his involvement in both fires to another inmate, Lane, and stated that, at Brown's house, he had "poured the alcohol" and Walsh had "lit the match." Lane reported those statements to Detective O'Daniel, the lead investigator of the fires, but, before discussing them, asked if he could get a reduced sentence in

exchange for the information. O'Daniel told him that he could not offer a deal.

Petitioner told another inmate, Naef, that he was going to have Buker and Walsh "whacked" for "snitching" on him. During the conversation, he referred to Brown as "Smoky" and bragged and laughed about the fact that he might be sentenced to up to 60 years. At the time, Walsh was going to be the best man at Naef's wedding.

When petitioner was brought to trial, the state's theory was that he had started the fire at Brown's house with the intent to kill Brown and his family. It called a number of witnesses who testified about the facts set out above.

The defense called only one witness, Fine, one of the firefighters who had responded to the fire at the Browns' house. He acknowledged that he had initially concluded that the fire was caused by spontaneous combustion. However, on cross-examination, he testified that, after communicating with the police department, he had no doubt that the fire was an arson. He also stated that burning plastic gives off toxic fumes. Finally, he stated that, had there not been working smoke detectors in the house, the possibility that the fire could have resulted in death was very great.

In closing arguments, the prosecutor relied primarily on three things in arguing to the jury that it should find that petitioner intended to kill the Brown family: the removed heating duct, petitioner's motive, and the use of an accelerant.[1] First, the prosecutor argued that the "missing duct work is clear indication of the intent of [petitioner]. He's going to start a fire and he's going to maximize the effect of that fire. This is deliberately removed. [Petitioner], before he set the fire, took off the duct work so the smoke would travel more readily up into that house. And it did."

---

[1] The prosecutor did not argue that the size of the fire demonstrated an intent to kill, but he did refer to the size of the fire, describing it as involving "flames six to seven feet high, almost touching the rafters." He also did not expressly argue that the presence of plastic items in the fire was evidence of intent to kill, but he did mention the burning plastic twice in his argument, as well as the "noxious fumes that can come from plastic."

Later, the prosecutor argued, "[Petitioner] had a persistent problem as he perceived it. [Petitioner] did not like Deputy [DA] Ron Brown. He did not like, told you quite clearly, the District Attorney or the court system, and he did something about it." He went on:

"What you know, what you know from the evidence in this case, what you know from his statements and what you know from what other people have told you. And you know from physical evidence in the sense that there's an accelerant used and you know that [petitioner] and Mr. Buker are tied like that, they're together. * * *

"* * * * *

"And then you look at motivation and you look at Mr. and Mrs. Brown. * * *

"Mr. Brown is a problem and a thorn in the side of [petitioner]. [Petitioner] perceived a problem and he sought a permanent solution. * * *

"Why didn't he use the gas can? That will be a question Ms. Kimble will raise for you. Well, the gas can's not obvious. You know, you don't intend to carry out this plan hoping that there's a gasoline can somewhere in that garage. No. You bring what you have and, in this case, alcohol with you to that scene so you can light the fire. That is intent to kill. And ladies and gentlemen, the intent to kill an entire family."

In the defense closing argument, petitioner's counsel, Kimble, attempted to raise reasonable doubts about the state's case. She argued that the police had focused their investigation on petitioner very quickly and had virtually ignored other leads. Kimble also pointed out that no fingerprints or DNA on any of the evidence matched petitioner. She also noted that Buker and Walsh's apartment was never searched to see if Buker still had the bottle of rubbing alcohol that he had borrowed from his neighbor. Kimble observed that none of the evidence had been tested for alcohol. She also noted that some evidence was lost in the initial clean-up after the fire in the Browns' house, before Kollen concluded that it had been an arson.

With respect to petitioner's motive, Kimble argued that the charges that Brown had filed against petitioner were

not very serious and would not inspire a person to kill a family of five in revenge. She pointed out that Brown was not the prosecutor in court on August 8, when petitioner first told Buker that he was being wrongly prosecuted and was going to "fix it" by setting a fire or blowing something up.

Kimble attempted to cast doubt on the statements Buker made in his interviews with Detective O'Daniel, pointing out that Buker had changed his story and minimized his own role in the fires. She noted that, at one point Buker himself told O'Daniel that he had lied in their previous interview.

Kimble attempted to discredit Prewitt's testimony, pointing out that Prewitt was Walsh's former girlfriend and that she visited him in jail once a week, suggesting that Prewitt was attempting to pin the blame for the fires on petitioner in order to help Walsh. She also pointed out that Prewitt had not initially told the police about petitioner's August 8 statement to Buker, and only mentioned it months later.

Kimble attempted to discredit Lane's testimony about petitioner's admission to having "poured the alcohol" while Walsh "lit the match" by noting that Lane had three prior felony convictions and had begun his interview with O'Daniel by asking if he could get a deal on his own charges. Similarly, she observed that Naef was Walsh's good friend.

The jury convicted petitioner on all counts. It also found aggravating facts that the state had charged with respect to several of the counts. As to the six first-degree arson charges, the jury found that the offenses represented a threat of serious physical injury and threat to human life. As to one of the first-degree burglary charges, Count 21, the jury found that the offense occurred in an occupied dwelling and represented a threat of serious physical injury and a threat to human life. The court sentenced petitioner to consecutive 120-month sentences on four of the attempted aggravated murder convictions and a consecutive term of six months on the second-degree arson conviction for the fire in the park. A number of the remaining convictions were merged for sentencing, and the court ultimately imposed two concurrent 90-month terms for the first-degree arson convictions and 18

months for the burglary convictions, all to be served concurrently with the other sentences. Thus, the court sentenced petitioner to a total of 40 years and six months in prison.

Two months later, Buker was tried for his involvement in the fires.[2] The state charged Buker with one count of attempted murder, two counts of first-degree arson, and one count each of first-degree burglary, recklessly endangering another person, and second-degree arson. The state's case against Buker was largely the same as its case against petitioner. The state called Prewitt, who again testified that petitioner had threatened to "blow up" someone's house or set it on fire in order to "correct the problem that the judicial system caused him * * *."[3] The state also presented the same witnesses, and elicited essentially the same testimony, as to the size of the fire at Brown's house and the facts that a heating duct had been removed, that plastic had been added to the fire, that alcohol may have been used as an accelerant, and that Buker had borrowed a bottle of rubbing alcohol a few days before the fire. The state also played for the jury the recordings of Buker's police interviews. In addition, the state put on testimony by a psychologist, who opined that Buker did not lack the mental capacity to form intent.

Buker's attorney, Perkins, mounted a two-pronged defense. First, he put on evidence suggesting that Buker lacked the ability to form the intent necessary to commit the crimes with which he was charged. In support of that defense, Perkins called two psychologists who testified that Buker had been diagnosed with mild mental retardation, attention deficit hyperactivity disorder, and organic mental disorder. They testified at length about Buker's mental conditions and opined that his ability to form intent was extremely limited, that he had difficulty remembering events accurately and would be susceptible to suggestion. Perkins also called several lay witnesses, who testified that Buker

---

[2] Buker's trial, particularly his defense, is pertinent to petitioner's post-conviction case because it demonstrates the sort of evidence that could have been presented at petitioner's criminal trial.

[3] As she had at petitioner's trial, Prewitt testified that she had not taken petitioner seriously, but she went further at Buker's trial, explaining that she had always known petitioner "to be a person that rants and raves about everything."

was unable to take care of himself and allowed people to take advantage of him.

In addition to the evidence concerning Buker's ability to form intent, Perkins put on evidence challenging the state's case that the participants in the fire at the Brown residence had intended to kill Brown and his family. First, he called as a witness Wright, one of the firefighters who had responded to that fire. Wright testified that the first thing he did upon arriving at the scene was to bend over and smell the pile of laundry that had burned, and that he did not smell anything. Perkins called another firefighter, Hite, who testified that, on a scale of one to 10, the fire at the Brown house was a "two" in terms of its seriousness, with a "one" being "something simple like a toaster fire, something on a counter, * * * that doesn't damage anything except for there's a little bit of smoke in the room."

Finally, Perkins called as a witness Slagle, an accident reconstructionist who had worked on more than 100 fires. Slagle investigated the fire at the Brown house in May 2003, three weeks before Buker's trial and nine months after the fire. Based on the reports from the police and fire investigations, Slagle concluded that the fire had been set intentionally. However, he asserted that an accelerant had not been used. He concluded that no petroleum-based accelerant had been used, based on the report of the test conducted by Kollen, the Oregon State Police arson detective, which revealed no oily sheen on the floor of the garage. Slagle also concluded that alcohol had not been used, for two reasons. First, he noted that, when water is put on a fire started with alcohol, the "alcohol actually dries the water and it will actually separate so you'll get a lack of water in certain areas where the alcohol is," which Kollen's report did not note. Second, he asserted that Wright would have detected alcohol when he smelled the pile of clothes that had been burned. Slagle testified that, in a test he conducted as part of his investigation, he had burned two piles of clothes, one with alcohol and one without, for 10 minutes before extinguishing them with a fire hose. He testified that he could still smell alcohol on the first pile.

Slagle also testified that the two piles of clothes he had burned were each approximately one foot in radius, which, he had deduced from the fire department report, was the size of the pile at the Browns' house.[4] He had videotaped the test, and the tape was played for the jury during Slagle's testimony. As the tape was playing, Slagle commented that the flames on both piles were two to three feet high.

Slagle also testified about the heating duct in the Brown home. He stated that it was a cold air return duct and that there was no evidence that it had been forcibly removed or that the fire had caused it to fall down.

Finally, Slagle also testified about the threat that the smoke from the fire presented. He opined that it did not create a threat of serious physical injury to the occupants of the house. According to Slagle, because the smoke would have had to travel horizontally through the cold air return duct and then up through the heat register, the smoke migration would have been minimal. He opined that most of the smoke that entered the living area had gone through the door at the top of the stairs between the garage and the living area when Brown opened it. He also testified that the small piece of plastic that was burned with the pile of clothes would not have made any difference to the toxicity of the smoke. Slagle stated as well that there was not enough fuel on the fire to generate a significant amount of smoke and that the fire would have gone out on its own eventually.

On cross-examination, Slagle conceded that he did not know how long the fire at the Browns' house had burned. He also conceded that some smoke had reached the living area of the house and had even left soot stains on the molding.

In closing arguments, Perkins primarily focused on Buker's mental condition, arguing that Buker lacked the mental capacity to form the intent to commit the charged offenses or to aid and abet petitioner in committing them,

---

[4] On cross-examination, Slagle explained that the fire department's report indicated that the fire had burned a two-foot diameter circle into the rug on which the pile had burned. He stated that the pile of clothes would have been that size or smaller.

and that his confession in the police interviews was a product of suggestion. He also argued, however, that the state had failed to prove that either Buker or petitioner had the intent to kill. In support of that position, he cited Hite's testimony that the fire was a "two on the scale of one to ten," as well as Slagle's testimony about the likely size of the fire, the amount and the toxicity of the smoke it produced, and his conclusions that no accelerant was used and that the heating duct was not forcibly removed.

The jury acquitted Buker of attempted murder, but it convicted him of the other charges.

In 2009, petitioner initiated this action for post-conviction relief, claiming that he had been denied adequate assistance of counsel at his criminal trial. Petitioner alleged several grounds in support of that claim, two of which are pertinent on appeal. First, he alleged that Kimble failed to conduct an adequate investigation of the fire at the Brown residence and, because of that, failed to secure evidence dispelling the inference that petitioner had intended to kill anyone. Second, he alleged that Kimble was inadequate for failing to challenge the reliability of Buker's statements during his police interviews, in which he implicated petitioner in the fires.

After petitioner initiated this action, Kimble filed an affidavit describing her preparation for petitioner's trial and her conduct of the defense. She stated that, within a week after being appointed to represent petitioner, she went to the Brown residence, looked into the open garage from the street, and walked around the sidewalk of the property to examine several areas described in the police reports, but did not go into the garage or onto the property. Kimble stated that she consulted with a private investigator and arson expert, Smith, and that he reviewed relevant police and fire marshal reports and answered her questions about the incendiary properties of rubbing alcohol. Kimble then asserted that petitioner had "described in careful detail to [her] how the fire originated, what was used to start the fire, and the manner in which duct work was removed in the Brown garage * * *." Kimble stated that, based on what petitioner had told her,

she "did not believe it would be any more informative or productive for [her] to retain Smith or another arson investigator to further examine the scene of the Brown fire." She stated that she did, in fact, telephone one of the firefighters who had responded to the fire to discuss the fire department's initial conclusion that the fire had resulted from spontaneous combustion. Kimble went on to state that she did not know whether, had the fire not been put out when it was, it "would have gone out by itself without causing structural damage to the house" or "whether the smoke caused by the fire would have risen to the ceiling of the garage and/or exited the garage through the open garage door." She also stated that she did not know how much smoke entered the living area or "whether it actually posed a serious danger of killing the Browns." She also stated that she was surprised at trial by the various witnesses' descriptions of the size of the fire, which made it sound bigger than the police and fire department reports had seemed to describe.

Later in the affidavit, Kimble stated, "I am unaware of any evidence which would have rebutted the State's inference that [petitioner] intended to kill the Brown family. Thus, I did not present such a defense."

After Kimble made that affidavit, petitioner filed his trial memorandum, to which he attached, as an exhibit, a copy of an affidavit made by Perkins. In his affidavit, Perkins stated, among other things, that, by establishing that petitioner, Walsh, and Buker did not intend to kill Brown or his family, he was able to obtain a not guilty verdict on the attempted murder charge against Buker. Perkins stated that Slagle's investigation and testimony were "critical" in providing him with evidence necessary to establish that the fire in Brown's house was not set with an intent to kill.

In response to Perkins's affidavit, Kimble made a second written declaration. In it, Kimble reiterated that petitioner had admitted to her that he had set the fire intending to kill Brown and that he and Walsh had used rubbing alcohol and had pulled the heating duct down from the ceiling. She also reiterated that she had consulted informally with Smith, the arson expert, and that he had "merely confirmed" petitioner's statements about the fire. Kimble stated that it

had been Smith's assessment that petitioner's plan to kill the Browns would have been successful had the smoke detectors not awakened the Browns. Kimble challenged Perkins's assertion that he had proved at Buker's trial that petitioner did not intend to kill anyone in the Brown house; rather, she averred, Perkins had proved only that *Buker* did not intend to kill anyone.

Subsequently, petitioner obtained affidavits from two investigators hired by his post-conviction counsel. One investigator, Cupit, averred that he had interviewed Smith and that Smith had stated that he recalled reviewing " 'about three pages' which included a fire report and a probation violation" report, and had concluded that the " 'fire was not going to do much' " because there was a " 'low fuel load' " and because the garage door was open, "disallowing sufficient heat to build up." According to Cupit, Smith told him that the heating duct "had obviously been removed by the suspects * * *."

The other investigator, Bates, averred that, in February 2008, petitioner's post-conviction counsel hired her to be present and take notes while he interviewed Kimble. According to Bates, during the interview, Kimble never indicated that she believed that petitioner intended to kill anyone, and she characterized the incident as a prank to scare Brown. Bates stated that Kimble had told counsel that Walsh had pulled down some duct work but did not state that he had done so in order to kill the occupants of the home.

A hearing was held on the petition for post-conviction relief. At the hearing, petitioner called as an expert witness a criminal-defense attorney who has specialized in murder cases since 1983. He testified about the appropriate standard of legal representation in a case such as petitioner's. Among other things, he testified that an attorney's obligation to investigate thoroughly and determine the best defense is the same regardless of whether the defendant confesses to the attorney that he or she actually committed the charged crime, explaining, "The mere fact your client said they did it doesn't mean the state can meet its many burdens, and you have a duty to investigate thoroughly and figure out the best possible * * * defense that you can put up on behalf

of your client." He testified further that the proper standard for determining the best theory of defense is to hire experienced investigators to investigate the case and use the information that they discover to narrow the case and concentrate on a particular defense.

The expert witness also testified that he had read the transcripts from petitioner's and Buker's respective criminal trials, as well as the various affidavits filed in this case. He opined that Kimble's representation did not meet the standard for adequate and effective assistance of counsel in Oregon. In his view, Kimble failed to discover information that she would have found had she investigated properly. He testified that, had she conducted an adequate investigation, a defense theory based on lack of intent to kill would have been available, citing the evidence presented by the defense in Buker's trial.

At the conclusion of the hearing, the court granted post-conviction relief, ordering a new trial. The court noted that the state's case as to intent to kill consisted chiefly of evidence of the threat posed by the fire—the size of the fire, the use of an accelerant, and the removal of the duct. It explained, "[T]he jury gets to look at the facts of the case and decide did somebody who did all that intend to kill somebody?" It concluded that, given the nature of the state's case, hiring a fire investigator and putting on evidence contradicting the state's evidence was critical to petitioner's defense against the attempted murder and attempted aggravated murder charges. The court concluded that, in addition to its relevance to the question whether petitioner intended to kill, the level of the fire was also critical to the arson charges, suggesting that Kimble could have persuaded the jury to find defendant guilty of a lesser offense if she had offered evidence that the fire was less serious than portrayed by the state.

The court found that Kimble "never even considered attacking the State's proof of intent to kill" and, furthermore, that she "didn't see the issue"—that is, that she did not see that the state would have to prove not only that petitioner started the fire, but that his conduct constituted specific crimes, elements of which the state would have to prove with evidence concerning the threat posed by the fire. It further

found that, because Kimble "didn't see the issue," her failure to hire a fire investigator and to challenge the state's evidence of the threat posed by the fire could not have been a strategy decision.

The court went to on conclude that Kimble was also deficient in failing to discredit Buker. It noted other failures by Kimble that "in themselves would not justify post-conviction relief, but when taken with everything else, became even more serious." The court entered a judgment with written findings and conclusions, at the end of which it stated, "The conviction is set aside, the sentence vacated and the case returned for a new trial."

On appeal, defendant (the superintendent of the Snake River Correctional Institution, where petitioner is incarcerated) argues that the post-conviction court erred in granting relief. In his first assignment of error, he contends that Kimble's failure to investigate the fire at the Brown home more extensively was not objectively unreasonable and, in any event, that petitioner suffered no prejudice as a result. In his second assignment of error, defendant argues that Kimble attacked Buker's credibility effectively and thus was not deficient but, even if she was, petitioner was not prejudiced. In his third and final assignment of error, defendant asserts that, if petitioner is entitled to relief, it should extend only to the attempted murder and attempted aggravated murder convictions.

To demonstrate inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution, a petitioner must show, "by a preponderance of the evidence, facts demonstrating that trial counsel failed to exercise reasonable professional skill and judgment and that petitioner suffered prejudice as a result." *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991). The petitioner suffered prejudice if counsel's failure had a tendency to affect the result of the trial. *Burdge v. Palmateer*, 338 Or 490, 492, 112 P3d 320 (2005). Whether a criminal defense counsel's failure to investigate, discover, or adduce evidence had a tendency to affect the outcome of a case must be assessed in light of the totality of the circumstances. *Horn v. Hill*, 180 Or App 139, 148, 41 P3d 1127 (2002). Under the Sixth Amendment to the United States

Constitution, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 US 668, 688, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984). We review post-conviction proceedings for errors of law. *Chew v. State of Oregon*, 121 Or App 474, 476, 855 P2d 1120, *rev den*, 318 Or 24 (1993).

> "The issues before us are whether the facts found by the post-conviction court are supported by evidence in the record, and whether the legal conclusion drawn from those facts is correct. We are bound by the [post-conviction] court's findings of fact if they are supported by evidence in the record."

*Id.*

We begin with defendant's contention that Kimble's investigation of the fire at the Browns' house demonstrated reasonable professional skill and that the post-conviction court erred in concluding otherwise. Defendant advances two general arguments in support of that contention. First, he asserts that Kimble reasonably believed that another investigation would be fruitless in light of petitioner's detailed confession to her that he intended to kill the Browns. That argument is unpersuasive. It assumes that petitioner did, in fact, make that confession to Kimble, despite the post-conviction court's express decision not to make that finding. In its initial statement of "findings and conclusions," the court wrote, "The defendant told his attorney that he started the fire and wanted to kill the occupants." Petitioner filed a motion to amend that finding, arguing that Kimble's statement about petitioner's confession was not credible in light of testimony by Bates, a witness to post-conviction counsel's interview with Kimble, that Kimble there stated that petitioner did *not* intend anything more than a "prank." *See* 247 Or App at 179. Subsequently, in an amended statement of "findings and conclusions," the court wrote that Kimble *"claims* that the defendant told her that he started the fire and wanted to kill the occupants." (Emphasis added.)

In any event, even assuming that petitioner did make that confession, it does not follow that an investigation would have been fruitless. Kimble could not know from petitioner's alleged confession whether evidence existed that would cast doubt on the state's case. Additional investigation was necessary to make that determination.

Second, defendant argues that Kimble's decision not to arrange for a further investigation of the fire was the product of her reasoned assessment of the case after reviewing the evidence, talking to petitioner, and evaluating her options. Defendant contends that Kimble did not pursue that line of inquiry because "there was nothing to see." According to defendant, the evidence that the fire was set below the living space and that the heating duct was removed demonstrated that, regardless of the size of the fire, petitioner intended for the smoke to enter the living area. Thus, in defendant's view, additional evidence of defendant's intent was cumulative and unnecessary.

We disagree. The state's case as to intent to kill rested to a significant degree on the evidence of the threat posed by the fire—primarily the use of an accelerant and the removal of the duct. The jury was asked to infer from that evidence that petitioner intended to kill the Browns. As the defense presented in Buker's trial illustrates, evidence could be adduced to challenge the state's evidence of the threat posed by the fire. Thus, issues *could have been* raised as to petitioner's intent. Contrary to defendant's argument, there was something to see. Further investigation was necessary to make an informed determination as to how to proceed with petitioner's defense.

In short, we reject defendant's argument that the post-conviction court erred in concluding that Kimble failed to exercise reasonable professional skill.

We turn to defendant's argument that petitioner suffered no prejudice as a result of Kimble's failure to conduct a more extensive investigation. Defendant focuses on Slagle's testimony at Buker's trial and argues that it is unlikely that it would have had an effect on the verdict in petitioner's case,

for two reasons: (1) because Slagle's testimony was problematic on the merits and (2) because it had little bearing on petitioner's intent because the risk the fire posed to the occupants of the house would have been of little utility to the jury in evaluating intent.

We disagree with both arguments. As the post-conviction court observed, the jury was asked to look at the evidence and decide whether a person "who did all that" intended to kill the Browns. As the record of Buker's trial shows, further investigation would have uncovered evidence suggesting that the fire was not as serious as portrayed by the prosecution, that an accelerant was not used, and that the heating duct was not forcibly removed. It is true that, as the state argues, such evidence, if it had been presented at petitioner's trial, might not have persuaded the jury that petitioner did not intend to kill the Browns. Slagle's testimony was not utterly persuasive in every respect. In addition, there was other evidence, not related to the threat posed by the fire, from which an intent to kill could be inferred—namely, the evidence of petitioner's motive and Prewitt's testimony that petitioner talked about "blowing somebody up and blowing up a DA's house."

Certainty, however, is not the appropriate standard in gauging the impact of trial counsel's performance. Rather, the question is merely "whether the omitted evidence would have a *tendency* to affect the outcome of the prosecution." *Horn*, 180 Or App at 148 (emphasis in original). The omitted evidence in this case meets that standard. Further investigation would have revealed more than just the evidence presented by Slagle at Buker's trial. For example, firefighter Hite testified at Buker's trial that, on a scale of one to 10, the fire at the Browns' house was a "two" in terms of its seriousness. Furthermore, Prewitt's testimony and the other evidence of petitioner's motive were not unassailable. Had the jury been persuaded that the threat from the fire did not demonstrate an intent to kill, it may have found that evidence unpersuasive as well. It follows that, with respect to the charges for crimes that contained, as an element, intention to kill, petitioner was prejudiced by Kimble's failure to provide adequate assistance of counsel and, furthermore,

that petitioner is entitled to post-conviction relief on those charges.

In his second assignment of error, defendant challenges the post-conviction court's conclusion that Kimble was constitutionally inadequate in failing sufficiently to discredit Buker. We agree with defendant. While Kimble's investigation regarding the seriousness of the fire was nonexistent and evidence that the fire was not nearly as serious as the prosecution painted it to be was arguably significant, her challenge to Buker's credibility was simultaneously more extensive and, to the extent it was shallow, less prejudicial. During her closing argument, for example, Kimble highlighted the contradictions in Buker's two interviews with police interrogators. She pointed out that Buker altered his account of the events, shifted blame, minimized his own role, and admitted to officers that he had lied to them. Petitioner maintains that his trial counsel should also have introduced evidence regarding Buker's marginal intelligence and his susceptibility to suggestion. But, as we noted on petitioner's direct appeal, albeit in the context of determining whether allowing some of Buker's testimony was plain error, "the 'gravity of error' in admitting Buker's statements was not significant. * * * Buker's statements were * * * largely cumulative and not likely to have had an impact on the jury's verdict." *State v. Galloway*, 202 Or App 613, 619-20, 123 P3d 352 (2005), *vac'd on other grounds*, 345 Or 315 (2008). We adhere to that conclusion. Trial counsel's treatment of Buker's testimony was not constitutionally inadequate.

That brings us to defendant's third assignment of error. The post-conviction judgment refers to and incorporates the court's "Amended Findings and Conclusions," which state, in turn, "The conviction is set aside, the sentence vacated and the case returned for a new trial." Although the use of the singular "conviction" creates some confusion, we nonetheless infer from the court's findings and conclusions that it intended to grant relief on all charges. Defendant asserts that, in doing so, the court erred. According to defendant, the operative petition for post-conviction relief focused exclusively on the attempted aggravated murder and attempted murder charges. He also asserts that petitioner

offered no evidence or argument for why counsel's performance had any tendency to affect the verdict on any of the other charges. Defendant acknowledges that this assignment of error is unpreserved, but he argues that we should review it anyway because he first learned of the post-conviction court's intention to grant relief on all convictions when the court issued its judgment and thus had no opportunity to object or otherwise challenge the court's ruling before it became final. We agree. Although an extremely attentive and perceptive attorney might have been able to discern from statements at trial that the court intended to grant complete relief, we conclude that expecting defendant's counsel to do so in this case would be expecting too much. We therefore consider defendant's third assignment of error.

As discussed above, we conclude that trial counsel's performance was constitutionally inadequate only with respect to her failure to investigate, and put on evidence regarding, the lethal potential of the fire that petitioner set at the Browns' home. That failure obviously had no tendency to affect the jury's verdicts regarding crimes that did not have, as an element, an intention to kill or to cause injury to a person or persons. Thus, the inadequacy had a tendency to affect the verdicts in the attempted aggravated murder and attempted murder charges. It also had a tendency to affect the first-degree burglary verdict; that crime, as charged and prosecuted in this case, involved entering and remaining in a building and, therein, "attempt[ing] to cause physical injury to any person." ORS 164.225(1)(b). The inadequacy did not, however, have an effect on the arson charges; neither first- nor second-degree arson requires the state to prove an intention to harm persons. ORS 164.315; ORS 164.325. The same is true, obviously, of *recklessly* endangering.

Judgment vacated and remanded for entry of judgment granting petition for post-conviction relief with respect to convictions for attempted aggravated murder, attempted murder, and burglary in the first degree, and denying such relief on all other convictions.