Submitted May 3; reversed in part and remanded for further proceedings consistent with this opinion, otherwise affirmed November 14, 2019; petition for review denied March 5, 2020 (366 Or 257)

PETER GEORGEVICH VASILASH,
*Petitioner-Appellant,*

*v.*

Brad CAIN,
Superintendent,
Snake River Correctional Institution,
*Defendant-Respondent.*

Malheur County Circuit Court
16CV0127; A166487

454 P3d 818

Petitioner appeals the denial of his petition for post-conviction relief (PCR), contending, among other assignments of error, that the post-conviction court erred in (1) concluding that petitioner failed to prove that he had been prejudiced by his trial counsel's deficient performance in failing to investigate and call a particular witness at his criminal trial and (2) denying petitioner's motion for leave to amend his PCR petition. *Held*: Because the witness's testimony could have tended to affect the outcome of petitioner's prosecution for first-degree kidnapping (Counts 1 and 2), petitioner was entitled to post-conviction relief as to those convictions. The post-conviction court's decision to deny petitioner's motion to amend was error in light of *Bogle v. State of Oregon*, 363 Or 455, 423 P3d 715 (2018), decided after petitioner's PCR trial in this case.

Reversed in part and remanded for further proceedings consistent with this opinion; otherwise affirmed.

J. Burdette Pratt, Senior Judge.

Peter Georgevich Vasilash filed the briefs *pro se*.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Peenesh Shah, Assistant Attorney General, filed the brief for respondent.

Before DeHoog, Presiding Judge, Aoyagi, Judge, and Hadlock, Judge pro tempore.

HADLOCK, J. pro tempore.

Reversed in part and remanded for further proceedings consistent with this opinion; otherwise affirmed.

**HADLOCK, J. pro tempore**

Petitioner was convicted after a jury trial of various offenses, the most serious of which was first-degree kidnapping, after an episode of domestic violence involving his girlfriend, V, that began at a Portland bar. After his direct appeal was rejected,[1] petitioner sought post-conviction relief (PCR) alleging inadequate and ineffective assistance of trial and appellate counsel under Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. The post-conviction court denied all of his claims, and petitioner appeals.[2] He raises six assignments of error. In his first assignment, he contends that the court erred in concluding that, although trial counsel's failure to investigate the owner of the bar and call her as a witness at petitioner's criminal trial was inadequate assistance of counsel, petitioner failed to prove that he was prejudiced by that deficient performance. *See Richardson v. Belleque*, 362 Or 236, 255, 406 P3d 1074 (2017) ("A petitioner seeking post-conviction relief based on inadequate assistance of counsel in violation of the right to adequate counsel derived from Article I, section 11, of the Oregon Constitution, must prove that his or her trial counsel failed to exercise reasonable professional skill and judgment and that, because of that failure, the petitioner suffered prejudice." (Internal quotation marks omitted.)).[3] We agree with petitioner that the bar owner's testimony "could have tended to affect" the outcome of petitioner's prosecution for first-degree kidnapping (Counts 1 and 2), *Green v. Franke*, 357 Or 301, 323, 350 P3d 188 (2015) (internal quotation marks and emphasis omitted), and, therefore, the post-conviction court erred in concluding that petitioner did not prove that he

---

[1] We affirmed without opinion on appeal, and the Supreme Court denied review. *State v. Vasilash*, 273 Or App 821, 362 P3d 1215 (2015), *rev den*, 358 Or 794 (2016).

[2] Petitioner represented himself at the PCR trial and also does so on appeal.

[3] As explained below, we conclude that petitioner is entitled to relief under Article I, section 11, which provides that, "[i]n all criminal prosecutions, the accused shall have the right *** to be heard by himself and counsel[.]" Consequently, we need not address petitioner's argument that the post-conviction court erred in denying his claim for relief based on his right to counsel under the federal constitution. *E.g.*, *Simpson v. Coursey*, 224 Or App 145, 156, 197 P3d 68 (2008), *rev den*, 346 Or 184 (2009).

was prejudiced as to those convictions. We therefore reverse and remand with instructions for the post-conviction court to enter judgment allowing post-conviction relief as to that aspect of petitioner's PCR claim.

Petitioner's fourth and sixth assignments of error raise procedural irregularities with respect to the post-conviction court's handling of petitioner's *Church* motion[4] and denial of his motion to amend his PCR petition; those arguments also have implications for petitioner's fifth assignment of error, in which petitioner asserts that the court erred in denying his PCR claim with respect to an allegation of inadequate assistance of counsel that petitioner raised in the amended petition that the court disallowed. Given that we must remand on petitioner's first assignment of error, and in light of the Supreme Court's intervening decision in *Bogle v. State of Oregon*, 363 Or 455, 423 P3d 715 (2018), discussed below, we also instruct the court on remand to allow petitioner an opportunity to amend his PCR petition to add the claims raised in his *Church* motion—that is, the claims that were not alleged in the petition filed by post-conviction counsel and adjudicated by the court. We reject petitioner's second and third assignments of error without discussion.

## I.   FACTUAL BACKGROUND

We describe the historical and procedural facts in accordance with the post-conviction court's findings and supplemented with undisputed facts from the record. *See Logan v. State of Oregon*, 259 Or App 319, 327, 313 P3d 1128 (2013), *rev den*, 355 Or 142 (2104) ("We are bound by the post-conviction court's findings if there is evidence in the record to support them."). When describing the evidence presented at petitioner's criminal trial, we focus primarily on the evidence related to the first-degree kidnapping convictions that are the subject of petitioner's first assignment of error. We supplement the facts, as necessary, in our analysis and resolution of the issues considered on appeal.

---

[4] The term "*Church* notice" or "*Church* motion" derives from the requirement, articulated in *Church v. Gladden*, 244 Or 308, 311-12, 417 P2d 993 (1966), and clarified in *Johnson v. Premo*, 355 Or 866, 878, 333 P3d 288 (2014), that a petitioner must inform the post-conviction court of his or her attorney's failure to raise certain grounds for relief and ask the court to either replace counsel or instruct counsel to raise those grounds for relief.

Petitioner was charged with two counts of first-degree kidnapping (Counts 1-2), second-degree kidnapping (Count 3), attempted second-degree assault (Count 4), four counts of coercion (Counts 5-8), fourth-degree assault (Count 9), strangulation (Count 10), recklessly endangering another person (Count 11), and harassment (Count 12). Counts 1 through 10 were alleged as constituting domestic violence.

At petitioner's trial, the victim, V, was a reluctant witness.[5] She testified that she and petitioner had been in an intimate relationship for 3 years, although petitioner was married to someone else. In the early morning hours of May 23, 2010, V and petitioner were together at the Ararat bar in Portland when they got into an argument. V testified at the criminal trial that petitioner may have hit her while at the bar. She wanted to go home but he took her to a park. She did not remember whether he hit her in the car, but she was feeling pain in her face and neck. She remembered trying to get out of the car at the park; she said it was possible that she was unconscious part of the time when she was in the car. She wanted to go to the hospital, but, instead, petitioner took her to her home. She went to a neighbor and asked her to call an ambulance.

Officer Jensen answered the call for assistance and met V at the neighbor's house. At the criminal trial, he testified that V spoke in broken English and looked as though she had been seriously assaulted, with serious swelling around her head and face, along with dried blood on her face, and a couple of swollen fingers. He also noticed that a large chunk of hair had been pulled out of the back of her head that was slightly bloody. Her hair was wet and matted and her clothes dirty and somewhat damp, although it had not been raining that night. Jensen said that V seemed fearful and very much in pain. When he asked, she immediately said that she wanted to go to the hospital.

At the hospital, Jensen took a statement from V, with Butkov, a certified nursing assistant, acting as an English/

---

[5] V had talked to the police and testified before the grand jury, but then disappeared. She was later found and held in jail as a material witness until petitioner's trial.

Russian translator.[6] Butkov testified at trial as to what V had told her that morning at the hospital. V told Butkov that petitioner had picked her up from a bus stop and they went to the Ararat. There, a man came up to petitioner and told him that he had had relations with V, which angered petitioner. He got into a confrontation with the other man and was asked to leave. Petitioner and V went outside, and petitioner struck V in the head. The bouncers asked them to leave. Petitioner grabbed V, pushed her into the car, and hit her a couple of more times. The bouncers tried to get her out of the car. She asked petitioner to take her home and he said that he would. He then took her to the park. She tried to escape when they stopped at the park, but he caught her, threw her down, and struck her in the face and abdomen. She tried to run away but he grabbed her by the hair and dragged her back to the car, continuing to beat her. She was in and out of consciousness. He put her back in the car, struck her a few times on the way home, then dumped her out in front of her house. She went to a neighbor's house and the neighbor convinced her to call the police. V eventually gave petitioner's name as her assailant.

Petitioner was arrested and interviewed by detectives later that morning. A videotape of the interview was played for the jury. In that interview, petitioner denied pushing V into the car or hitting her. He told the detectives that he and V had been drinking together at the bar, and he took V home after being told by security to leave the bar. Later, he said that when they got to her house they sat and talked for two hours, but he did not remember what they talked about.

Over petitioner's objection, the state also presented the testimony of two grand jurors who testified to V's sworn statements before the grand jury. As relevant here, the foreperson testified that V had told the grand jury the following version of events. Petitioner hit her in the face while they were still at the bar. Bar staff asked if she wanted to call the police, but she said that she did not because she was afraid. She went outside to get her belongings from petitioner's car.

---

[6] Jensen asked the questions in English, Butkov translated them into Russian for V, V answered in Russian, and Butkov translated V's answers into English for Jensen.

She testified that bar staff told them to get in the car or they would call the police. She did not remember whether petitioner pushed her into the car. According to the foreperson, V testified to the grand jury that "she didn't want to get in the vehicle in the first place on the first part of the trip because she was afraid she was going to get hit again."

V's neighbor, Friend, also testified at petitioner's criminal trial. She stated that V came to her door early in the morning and told Friend that her boyfriend had beaten her and tried to kill her. Her face was swollen and there was blood on the side of her mouth. V told Friend that she and petitioner had been drinking at a club and petitioner had taken her to another place and beat her first in a building and then in a park. She asked Friend to call an ambulance.

Additionally, a detective and a criminalist testified as to what they saw when they examined petitioner's car, and the state presented photos, medical records, and other physical evidence of V's injuries.

Petitioner did not present any witnesses at the criminal trial. The defense's theory was that V was upset because petitioner had ended their affair and the confrontation turned physical on both sides after they left the bar. V then exaggerated what had happened and later felt bad about that and did not want to participate in the prosecution. During closing argument, petitioner's counsel acknowledged the assault, but challenged the sufficiency of the state's evidence on kidnapping and other charges, pointing out inconsistencies in the various versions that V told about the events that morning.

The jury convicted petitioner of two counts of first-degree kidnapping (Counts 1 and 2), second-degree kidnapping (Count 3), attempted second-degree assault (Count 4), two counts of coercion (Counts 5 and 6), fourth-degree assault (Count 9), reckless endangerment (Count 11), and harassment (Count 12).[7] The jury's verdicts were unanimous except with respect to Count 1; on that count, the jury voted

_____

[7] The jury acquitted petitioner of strangulation (Count 10) and the court granted petitioner's motion for judgment of acquittal on two counts of coercion (Counts 7 and 8).

11 to 1 to convict. At sentencing, the court merged peti-
tioner's first-degree kidnapping verdicts (Counts 1 and 2)
and sentenced him to a total prison term of 120 months.

After an unsuccessful direct appeal, petitioner
filed for post-conviction relief, alleging that he was denied
the right to adequate and effective assistance of trial and
appellate counsel under Article I, section 11, of the Oregon
Constitution and the Sixth and Fourteenth Amendments to
the United States Constitution. In the operative petition,[8]
he alleged, in his first claim for relief, that trial counsel was
inadequate for (1) failing to investigate and obtain evidence
from two witnesses—Gregorian, the bar owner, and Styopin,
a customer who was also present at the bar that night
(claim 1-A)—and (2) failing to object to the trial court's rea-
soning in rejecting counsel's hearsay objection to the testi-
mony at trial of the two grand jurors (claim 1-B). Petitioner's
second claim for relief alleged inadequacy of appellate coun-
sel (claim 2). The post-conviction court entered a judgment
denying the petition in all respects, which petitioner appeals.

## II.   ANALYSIS

A.   *Petitioner's First Assignment of Error*

Petitioner's first assignment of error challenges the
post-conviction court's denial of his petition as it relates to
claim 1-A, in particular, trial counsel's failure to investigate
Gregorian, the owner of the Ararat, and call her as a wit-
ness.[9] As noted, petitioner contends that the post-conviction
court erred in concluding that counsel's deficient perfor-
mance in that respect did not prejudicially affect the out-
come of his prosecution for first-degree kidnapping (Counts
1 and 2).[10] We agree.

---

[8] We refer here to the amended petition that was filed by petitioner's post-
conviction counsel and adjudicated by the post-conviction court. As noted, peti-
tioner later moved to amend his petition again, which the court denied. We dis-
cuss that petition later in this opinion.

[9] On appeal, petitioner does not challenge the court's denial of claim 1-A as
it relates to Styopin. Nor does petitioner assign error to the court's denial of his
claim of ineffective assistance of appellate counsel (claim 2). The court's denial of
claim 1-B is the subject of petitioner's third assignment of error, which as noted,
we reject without discussion.

[10] Although in his trial memorandum (when he was still represented by coun-
sel), petitioner contended that Gregorian's testimony "would have raised doubt

Gregorian testified at the PCR trial, and the post-conviction court expressly found her testimony credible. Gregorian testified that she was at the Ararat the night the incident occurred. She stated that she had observed V drinking that night and that V had been "cut off" from buying alcohol because of her apparent intoxication. Gregorian testified that she did not remember if there were any altercations between petitioner and V inside the bar. She indicated that the police were not called because the incident was not serious, "just an argument between [petitioner] and a drunk drunk girlfriend." Gregorian further testified that she was inside the bar when petitioner and V left around 3:00 or 4:00 a.m. When she heard that there was a disturbance outside, she went outside and saw V, who was "really, really drunk," "trying to sit in the car," saying "I came with you and I'm going to go with you." She also testified that she would have been available to so testify at petitioner's criminal trial had she been contacted about petitioner's case.

Petitioner's trial counsel also testified at the PCR trial. She stated that her "recollection was that the vast majority of the charges had to do with what happened in the park. And my investigation was really focused on the victim herself and her history and whether or not she was going to come to trial, and witnesses who could potentially testify about her." When asked whether she believed that the witnesses at the bar should have been interviewed, counsel stated:

> "[I]n hindsight, it's always good to have more information, but *** I was mainly focused on the victim, whether or not she was going to show up, whether or not she was credible, because I don't—again, I—the focus of the case for the kidnapping was really the transportation to the park and keeping her at the park. That is my recollection. And I don't think the circumstances of how she got into the car, specifically, would have changed the outcome specifically to the kidnapping in the first degree count."

---

as to all of the material elements in [Counts 1, 4, 5, and 9], affecting the jury's findings on [those counts]," on appeal, petitioner challenges the post-conviction court's conclusion that he was not prejudiced by counsel's inadequate representation only as it relates to his first-degree kidnapping conviction. Accordingly, we limit ourselves to that question.

The post-conviction court concluded that petitioner had proved that counsel "was ineffective for failing to investigate and contact Gregorian and call her as a witness":

> "Counsel admitted not trying to contact people at the bar even though the events started at the bar and some of the crimes were alleged to have occurred at the bar (Coercion) or began at the bar (Kidnapping Count 1). Gregorian was the owner of the bar and would have been a reasonable person to contact as part of a reasonably adequate investigation."

However, the court ruled that petitioner had not proved that he was prejudiced by counsel's failure to call Gregorian as a witness at petitioner's criminal trial, as was required for him to prevail. It explained:

> "[Gregorian] testified that she did not see the altercation between Petitioner and [V] in the bar but did see Petitioner put her in the car. She also testified that [V] wanted to get into the car and there was an argument. Gregorian did not testify as to whether or not she saw Petitioner forced [*sic*] [V] into the car. Although she was aware that [V] was intoxicated she did not testify that she fell or was otherwise injured at the bar. *Petitioner has not proven that a reasonable attorney would have called Gregorian as a witness if available because Petitioner had adopted the strategy of calling no witnesses and challenging the state's evidence. The addition of Gregorian's testimony, if offered at the original trial, was not particularly helpful to Petitioner and was not enough to have had a tendency to affect the outcome of the trial.*"

(Emphasis added.) Accordingly, the court denied petitioner's claim.

Petitioner contends that the court improperly conflated the two prongs of the constitutional test for inadequate assistance of counsel and also erroneously applied a "heightened" prejudice standard. Alternatively, petitioner challenges the court's ultimate conclusion that petitioner was not prejudiced by trial counsel's deficient investigation and failure to call Gregorian as a witness at his criminal trial.

In response, defendant superintendent argues that the court correctly concluded that petitioner's claim failed

for lack of prejudice because Gregorian's "potentially exculpatory testimony was limited to the victim's intoxication and the circumstances surrounding [the victim's] apparently voluntary departure with petitioner in his car"; therefore, it "would not have affected the jury's determination of what happened *after* the victim left with petitioner, which is when the state argued that most of the charged conduct occurred." (Emphasis in original.) Defendant also contends that, even if the court applied the wrong legal standard for proving prejudice, we should independently address that question and affirm.

Whether a petitioner has established the prejudice prong of his inadequate assistance of counsel claim is ultimately a legal question, although it may be dependent on predicate facts. *Logan*, 259 Or App at 327. But, "if the trial court has rendered findings on all historical facts material to assessing prejudice, this court is fully competent to determine whether petitioner has suffered prejudice of a constitutional magnitude." *Ashley v. Hoyt*, 139 Or App 385, 396, 912 P2d 393 (1996); *see also Maxfield v Cain*, 295 Or App 553, 557, 435 P3d 779 (2019) (confirming that determination of prejudice is a legal question that appellate court may decide, although ultimately declining to do so). That is the case here. And, both parties have essentially requested that we address that legal question without remanding to the trial court. Hence, we need not decide whether the court's ruling reflects an incorrect understanding or application of the prejudice prong of petitioner's claim. Rather, accepting the court's findings of historical fact (which are supported by the record), we independently consider whether petitioner has met his burden of proving that he was prejudiced by counsel's deficient performance in failing to "investigate and contact Gregorian and call her as a witness."

In *Farmer v. Premo*, 363 Or 679, 700-01, 427 P3d 170 (2018), a recent "failure to investigate" case, the Supreme Court reiterated what is required for a petitioner to prove the prejudice prong of an inadequate assistance of counsel claim:

"Under Article I, section 11, where the effect of an attorney's failure during a jury trial is at issue, only those

errors that 'could have tended to affect' the outcome of trial require [reversal]. *Green*, 357 Or at 322. In that instance, a petitioner must demonstrate 'more than mere possibility, but less than probability,' that counsel's error affected the verdict. *Id*. Specifically, in a 'failure to investigate' case, a petitioner must show that there is 'more than a mere possibility' that competent counsel 'could have used' the information that counsel failed to uncover or understand in a way that "'could have tended to affect'" the outcome of trial. *Richardson*, 362 Or at 266 (quoting *Green*, 357 Or at 323)."

As noted, petitioner asserts that Gregorian's testimony (as found by the post-conviction court) that V "wanted to get into the car" at the bar "could have tended to affect" the outcome on the first-degree kidnapping charges, Counts 1 and 2. We agree.

As charged here, the state was required to prove, with respect to Count 1, that petitioner "did unlawfully and knowingly, without consent or legal authority, take [V] from one place to another, with intent to interfere substantially with the personal liberty of [V], and with the purpose of causing physical injury to [V.]"[11] Count 2 required the state to prove that petitioner did the same, except with the purpose of "terrorizing V."[12] In closing argument, the prosecutor explained to the jury that the two counts were "essentially *** two different ways to get to the same charge, Kidnapping in the First Degree," with the difference being the purpose element. The state also clarified that Counts 1 and 2 were based on petitioner taking V from the bar to the park, whereas Count 3, second-degree kidnapping (not implicated here), was based on petitioner forcing V back into the car at the park and taking her home instead of to the hospital as she wanted. The court instructed the jury as to

---

[11] A person commits the crime of first-degree kidnapping if the person commits second-degree kidnapping with any of several enumerated purposes, including, as relevant here, "[t]o cause physical injury to the victim," ORS 163.235 (1)(c), or "[t]o terrorize the victim or another person," ORS 163.235(1)(d). In turn, a person commits second-degree kidnapping "if, with intent to interfere substantially with another's personal liberty, and without consent or legal authority, the person *** [t]akes the person from one place to another[.]" ORS 163.225(1)(a).

[12] Both counts were also charged as constituting domestic violence, alleging that petitioner and V were family or household members as defined by ORS 135.230(4).

the above-described elements of first-degree kidnapping as charged in this case; it further instructed the jury that

> "[w]ithout consent means the taking of another person from one place to another is [*sic*] accomplished by force, threat, or deception. And then a person acts intentionally or with intent or acts with a purpose when that person acts with a conscious objective to cause a particular result. And a person intentionally interferes with another person's personal liberty by either forcing that person to move a substantial distance from one place to another, intending to force the person to move a substantial distance, or intending to confine the person for a substantial period of time."

Thus, one of the contested issues at trial was whether V consented to going with petitioner in his car from the bar or whether petitioner took V by "force, threat, or deception," and, relatedly, whether petitioner intended to interfere substantially with V's personal liberty in doing so. Both parties focused on those questions during closing arguments before the jury.

For its part, the state highlighted Butkov's testimony that V had said that petitioner pushed her inside the car and took off from the bar, which, the state asserted, showed that V "was forced inside [petitioner's] vehicle against her will without consent." The state also pointed to V's testimony before the grand jury that she got into the car because she was afraid that petitioner would hit her again and that she did not want to be in the car, which, the state argued, established that V was not permitted to leave and was taken to the park against her will. That testimony, according to the state, was proof of "either rendition of th[e] First Degree Kidnapping Charge."

Defense counsel, on the other hand, asserted that the state failed to prove that petitioner knowingly took V from the bar to the park without her consent, pointing out various inconsistencies in the witnesses' testimony. Counsel argued:

> "[Petitioner] had to act without consent of [V] in taking her from one place to another. That has to be accomplished by either force, threat, or deception. Again, we don't have evidence that he forced her (indiscernible). The evidence

that we have of getting his car to the bar is inconsistent, but again, it only supports that (indiscernible) her free will. There's no evidence that he threatened to get in the car. Again, there's a complete absence of evidence anywhere about (indiscernible). There's nothing along those lines. And deception, again, there's no evidence that he (indiscernible)."

Counsel pointed out that there was nothing in the first version of the incident that V relayed to Friend "about how she actually got into the car, whether or not it was willing, and that's really the key factor here." And, counsel argued, V told the grand jury that she got into the car on her own because of what the security guards said. In rebuttal, the prosecutor again emphasized the evidence that V did not willingly leave the bar with petitioner.

With that backdrop in mind, we consider Gregorian's testimony at the PCR trial. As described above, Gregorian said that, had she been contacted by the defense, she would have testified that V was "really really drunk" outside the bar that night and that she witnessed V "trying to sit in the car," saying "I came with you and I'm going to go with you"—in other words that, as the post-conviction court found, V "wanted to get into the car" with petitioner, which would have supported the defense position that V willingly left with petitioner. The state acknowledges as much, but contends that counsel's failure to procure Gregorian's "potentially exculpatory testimony" was nonetheless not prejudicial because it was "limited to [V's] intoxication and the circumstances surrounding [her] apparently voluntary departure with petitioner in his car" and, therefore, "would not have affected the jury's determination of what happened *after* the victim left with petitioner, which is when the state argued that most of the charged conduct occurred."

It is correct to say that "most" of the conduct charged by the state occurred after petitioner and V left the bar in his car; nonetheless, among the elements the state was required to prove for the first-degree kidnapping charges was that petitioner knowingly took V from one place to another (the bar to the park) *without her consent*—that is, "accomplished by force, threat, or deception"—and with the intent to interfere substantially with her liberty. Gregorian's testimony

that V had indicated that she *wanted to* leave with petitioner went directly to those material elements of first-degree kidnapping and tended to undermine the state's theory that petitioner had "forced" V into petitioner's car or that V got into the car because she felt threatened.

As the record establishes, V herself was an uncooperative witness at trial, and, according to the other witnesses' testimony, it appears that she also gave widely varying accounts to different people, after the fact, of why she got into the car and left the bar with petitioner—because petitioner "pushed" her into the car; because she was afraid petitioner would hit her again; or because the bouncers said that they were going to call the police. Gregorian's testimony, had it been presented, would have provided the jury with a contemporaneous, first-hand account—by someone other than V—as to V's behavior and statements that morning, including V "trying to get in the car" and saying, "I came with you and I'm going to go with you," referring to petitioner. Given that the evidence on the issue of consent was subject to such arguably differing interpretations, Gregorian's testimony might well have had a tendency to affect the result of the jury's verdict. *See Stevens v. State of Oregon,* 322 Or 101, 110, 902 P2d 1137 (1995) (counsel's unreasonable failure to adequately investigate and discover disinterested witnesses who would have called into question "pivotal testimony of the complaining witness" satisfied "tendency to affect" standard).

To be sure, even with Gregorian's testimony, petitioner might not have persuaded a jury that his conduct did not constitute first-degree kidnapping; however, petitioner's putative evidence need not be definitive to be deemed prejudicial. *Lichau v. Baldwin*, 333 Or 350, 364, 39 P3d 851 (2002) (rejecting state's position that the petitioner was not prejudiced by his counsel's failure to offer alibi evidence because the evidence "fail[ed] to prove anything with certainty"). Rather, consistently with the standard articulated in *Farmer* and prior cases, we conclude that it is "more than a mere possibility" that competent defense counsel could have used Gregorian's testimony in a way that "could have tended to affect" the outcome of petitioner's prosecution for first-degree kidnapping. 363 Or at 700-01 (internal quotation

marks omitted). Consequently, petitioner is entitled to post-conviction relief as to that aspect of his claim.

B. *Petitioner's Fourth and Sixth Assignments of Error*

The procedural background informing petitioner's fourth and sixth assignments of error is somewhat complicated. On September 19, 2017, the post-conviction court held a hearing to consider petitioner's motion to remove and replace his counsel.[13] At that hearing, petitioner also raised an objection to the court's earlier denial of his third request for an extension of time to file his *Church* notice, which petitioner apparently had mailed the day before, but which the court had not received. Based on its understanding that, under *Lopez v. Nooth*, 287 Or App 731, 403 P3d 484 (2017), it was not required to hold a hearing on a *Church* notice, the court ruled that petitioner could file his *Church* notice up until October 2, the day before trial. The court also denied petitioner's motion to remove and replace his counsel. Petitioner then orally indicated that he wanted to proceed *pro se*. The court granted that request, explaining, however, that petitioner would not be allowed to amend his PCR petition, but instead would be limited to arguing the claims in the amended petition filed by post-conviction counsel. On September 21, the court entered an order reflecting those rulings:

> "IT IS HEREBY ORDERED petitioner has until October 2, 2017 to file a *Church* notice. Petitioner will proceed pro se to trial on October 3, 2017 limited to arguing claims alleged in the last Amended Petition. Petitioner's counsel shall be standby counsel for the limited purpose of assuring the three witnesses contemplated appear at trial."

On September 22, the post-conviction court entered an order denying petitioner's *Church* notice (entitled "Motion to Instruct Petitioner's Counsel"), in which petitioner asserted grounds for post-conviction relief that his counsel had failed to raise, along with points and authorities explaining why those grounds were "legitimate issues." (Internal quotation marks omitted.) The court noted that, although petitioner had signed the motion on September 18,

---

[13] The motions described in this section were decided by a different judge than the judge who presided over the PCR trial.

it was not filed until September 21, and, in the intervening time—that is, on September 19—petitioner had elected to represent himself. As a result, the court ruled, the issue was moot "as there is no longer any counsel to instruct."

On September 27, petitioner filed a *pro se* motion for leave to file an amended PCR petition, asserting, in part, that amendment should be granted because the court erred in allowing petitioner to file his *Church* motion up until October 2, but deciding that it would not take any action on it. Petitioner attached the proposed amended petition, which, consistent with his *Church* notice, added 11 additional allegations of inadequate assistance of trial counsel and two additional allegations of inadequate assistance of appellate counsel that were not included in the amended petition filed by counsel.

The post-conviction court considered petitioner's motion to amend on the day of trial, October 3. Petitioner argued that his motion was based on his "fundamental right to be heard" on his *Church* notice, which the court had not considered. Petitioner also argued that the court was required to allow petitioner to amend the petition because it had given him leave to proceed *pro se*. Defendant's counsel did not expressly object, responding that he would need a continuance if the motion were allowed. The court denied the motion to amend, stating again that, under *Lopez*, it was not required to hold a hearing on petitioner's *Church* notice. The court also explained that the amended petition was untimely and noted petitioner's agreement to go to trial on the petition filed by his attorney as a condition of being allowed to proceed *pro se*. The case was then tried on the amended petition filed by counsel.

In his fourth assignment of error, petitioner asserts that the post-conviction court "erred in refusing to hold a hearing and consider petitioner's *pro se* claims for relief raised in his *Church* notice." In his sixth assignment of error, he contends that the court abused its discretion in denying his motion for leave to file an amended petition. Petitioner emphasizes that the court's denial of his motion to amend was based on purely procedural grounds; the court did not undertake to assess whether any of the newly asserted

claims were viable. As explained below, we conclude that, given the circumstances described above, and in light of the Supreme Court's intervening decision in *Bogle*,[14] the post-conviction court erred in denying petitioner leave to file an amended petition; we therefore need not address petitioner's fourth assignment.

We review the denial of a motion to amend for abuse of discretion. *Ramsey v. Thompson*, 162 Or App 139, 144, 986 P2d 54 (1999), *rev den*, 329 Or 589 (2000). "[W]hile the trial court has 'broad discretion' with respect to amendment of post-conviction pleadings, the exercise of that discretion should comport with ORCP 23 A's directive that leave to amend 'shall be freely given when justice so requires.'" *Id.* (quoting *Temple v. Zenon*, 124 Or App 388, 390, 862 P2d 585 (1993)). Moreover, where a trial court's "purported exercise of discretion flows from a mistaken legal premise, its decision does not fall within the range of legally correct choices and does not produce a permissible, legally correct outcome." *State v. Romero*, 236 Or App 640, 644, 237 P3d 894 (2010); *see also State v. Pemberton*, 226 Or App 285, 289, 203 P3d 326 (2009) (exercise of discretion based on mistaken premise of law can be failure to properly exercise discretion).

Here, it is apparent that the post-conviction court's exercise of discretion in denying petitioner leave to amend was based on a mistaken legal premise given the Supreme Court's subsequent decision in *Bogle*—specifically, the post-conviction court mistakenly believed that it was not required to act on petitioner's *Church* motion. In *Bogle*, the court allowed review to "clarify what *Church* authorizes a petitioner to file, what a post-conviction court is required to do in response to a *Church* motion, and what effect a *Church* motion has on a subsequent post-conviction case." 363 Or at 464. The court explained that, "to prevail on a *Church* motion, a petitioner must show that counsel has failed to raise a ground for relief and, in doing so, has failed to exercise reasonable professional skill and judgment." *Id.* at 473. Consequently, that is the inquiry for a post-conviction court presented with a *Church* motion—"whether the petitioner has established that, in choosing which grounds for relief

---

[14] *Bogle* was decided after petitioner's PCR trial.

to raise, counsel has failed to exercise reasonable professional skill and judgment." *Id.* In answering that question, the court's response may vary depending on the circumstances; however, as the Supreme Court made clear, the court "has an obligation to consider and rule on the motion." *Id.* And, although a hearing may or may not be required, again, depending on the circumstances, "[g]enerally, a post-conviction court presented with a proper *Church* motion should review the motion and give the petitioner a reasonable opportunity to establish the basis for replacement or instruction of the petitioner's current counsel." *Id.* at 474.

Significantly, the court further explained that, if the post-conviction court denies the petitioner's *Church* motion, and the petitioner still wants to raise the grounds for relief that counsel declined to include, the petitioner has two options: "[T]he petitioner can move to dismiss counsel and proceed *pro se* and, if that motion is granted, raise the grounds personally. Alternatively, the petitioner can continue with current counsel and, if need be, challenge the denial of the *Church* motion on direct appeal[.]" *Id.*

Here, because the court was operating on an understandable, but ultimately incorrect, perception of what it was required to do in response to petitioner's *Church* motion (which the court allowed petitioner to file), it never evaluated whether post-conviction counsel "exercised reasonable professional skill and judgment" in declining to assert petitioner's additional grounds for relief, and, consequently, petitioner was denied the opportunity to address whether he had established a basis for replacing or instructing counsel. Instead, the court allowed petitioner to proceed *pro se*, but with the understanding that he would go to trial on the petition filed by counsel, thus depriving petitioner of an opportunity to "raise the grounds personally" by allowing him to amend his petition. In those circumstances, particularly considering the "strict *res judicata* provisions" of the Post-Conviction Hearing Act, *see* ORS 138.550(3), and "the fact that a petitioner cannot bring a subsequent post-conviction case to challenge the adequacy of post-conviction counsel," *Bogle*, 363 Or at 474, the court's decision to deny petitioner's motion to amend did not "fall within the range of legally correct choices." Therefore, the court erred. On remand,

the court must allow petitioner an opportunity to amend the petition to add the claims raised in petitioner's *Church* motion, that is, those claims that the court has not already adjudicated.

## C.   *Petitioner's Fifth Assignment of Error*

Petitioner's fifth assignment of error addresses a claim of inadequate assistance of trial counsel that was not included in the petition that the court ruled on, but that petitioner asserted in his *Church* motion and amended petition, which the court disallowed. Our resolution and disposition of petitioner's sixth assignment of error obviates the need to address this assignment of error.

Reversed in part and remanded for further proceedings consistent with this opinion; otherwise affirmed.